**AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI, INC., et al., Plaintiffs-Appellants,**

v.

**Cliff FINCH, Governor of the State of Mississippi et al., Defendants-Appellees.**

No. 79–2175.

United States Court of Appeals, Fifth Circuit. Unit A

March 13, 1981.

Christopher R. Kelley, Robert Rubin, Jackson, Miss., Jack D. Novik, New York City, for plaintiffs-appellants.

A. F. Summer, Atty. Gen. of Miss., J. Stephen Wright, Sp. Asst. Atty. Gen., Peter M. Stockett, Jr., Asst. Atty. Gen., Darold L. Rutland, Jackson, Miss., for defendants-appellees.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiffs/appellants brought this § 1983 action based on alleged violations of their first amendment and other constitutional rights. They sued the defendant state officials in their official capacities for declaratory and injunctive relief and in their individual capacities for damages. The district judge, relying on the doctrine of sovereign immunity, dismissed this case entirely on his own motion, without the benefit of briefs or argument. He made three rulings. We reverse all three and hold that this case was erroneously dismissed.

## I.

In February 1977 the American Civil Liberties Union of Mississippi, two individual Mississippi residents, and the Delta Ministry, a Mississippi-based organization, brought this unusual civil rights action. Its gravamen is that various Mississippi officials violated, and continue to violate, the plaintiffs' first amendment and other constitutional rights by harassment and by surveillance of their lawful activities. The complaint details by way of example three specific instances of allegedly unlawful intrusion.[1] The plaintiffs contend that these incidents were not isolated events, but were part of a continuing pattern of conduct stretching back as far as 1964 and continuing to the date of the complaint.

The complaint asserts four causes of action, two for injunctive and declaratory relief, and two for compensatory and punitive damages. The claims for injunctive and declaratory relief are asserted on behalf of a class of all who "have been and are subjected to the defendants' unlawful governmental intrusions". The damage claims are asserted on behalf of the named plaintiffs alone. Originally named as defendants were Cliff Finch, Governor of Mississippi at the time the complaint was filed; A. F. Summer, then attorney general; Heber Ladner, then secretary of state; James Finch, then commissioner of public safety; and W. Webb Burke, who was from 1968 to 1974 the director of the now-defunct Mississippi Sovereignty Commission. Although the complaint does not explicitly so state, it is plain from the form of relief sought that all five defendants were sued in their individual capacities with respect to the damage claims and that the first four defendants, alone, were sued in their official capacities with respect to the claims for injunctive and declaratory relief. Neither the state nor any state agency was named as a defendant to any claim.

The plaintiffs contend that some but not all of the defendants' political surveillance and harassment took place under the aegis of the Sovereignty Commission.[2] Shortly after this suit was filed, the Mississippi legislature passed a law formally abolishing the Commission, which had been unfunded and moribund since 1974. The statute also

---

1. They are: (1) In 1972 defendant Ladner allegedly advised the Federal Bureau of Investigation that plaintiff Lawrence had filed a petition with Ladner's office containing the names of people who wished to see certain—presumably unpopular—candidates placed on the general election ballot. As a result, FBI agents allegedly approached associates of Lawrence, questioned them, and advised them to avoid him. (2) In March 1971 defendant Burke allegedly gathered unspecified "illegal intelligence data" about plaintiffs Brooks and Delta Ministry and disseminated it to the state Office of Human Resources and Community Services. Those data were then used to cause internal strife in an organization in which Brooks participated and to halt that organization's federal funding. (3) In October or November 1971 defendant Burke allegedly gathered "illegal in-

telligence data" about plaintiff American Civil Liberties Union of Mississippi and disseminated it to the Dean of Student Affairs at the University of Southern Mississippi for the purpose of interfering with the ACLU's attempt to organize a chapter at that school.

Neither the truth nor the legal sufficiency of these or the plaintiffs' other allegations are in issue on this appeal.

2. The Sovereignty Commission was established in 1956 with the stated mission of performing "all acts and things deemed necessary and proper to protect the sovereignty of the State of Mississippi, and her sister states, from encroachment thereon by the federal government...." 1956 Miss. Laws Ch. 365, § 5, codified in Miss. Code Ann. § 3–1–11 (1972).

sealed the Commission's files and records until the year 2027. Miss. Code Ann. §§ 39–5–61 to –65 (Supp.1977).[3] The statute did not, however, explicitly create an evidentiary privilege. According to the plaintiffs, the files and records of the Sovereignty Commission constitute primary evidence in this case. They therefore subpoenaed the files from their custodian, the state Director of Archives and History.[4] Relying on Miss. Code Ann. §§ 39–5–61 to –65, the Director declined to comply with the subpoena. In a brief order dated July 6, 1978, however, the district court granted the plaintiffs' motion to compel production of the documents, subject to the Director's right to assert other privileges for particular documents. Although the order did not explicitly refer to Miss. Code Ann. §§ 39–5–61 to –65, that statute was the sole justification advanced for noncompliance. In effect, the court held that the statute did not create any evidentiary privilege to which a federal court trying these federal claims was bound to yield.

Despite that order, the Director delayed production of the Sovereignty Commission's files and records. The plaintiffs again moved to compel their production. When the government moved for *in camera* inspection of certain documents assertedly privileged, the magistrate in charge of discovery ordered the defendant to prepare "an analysis cataloging the specific claim or claims [of privilege] as to each document". The plaintiffs objected to the "analysis" eventually submitted on the ground that it was insufficiently detailed to permit them to challenge effectively the claims of privileges.[5] The magistrate ruled against the plaintiffs, but stayed *in camera* inspection pending review of his ruling by the district court. Both the plaintiffs' application for review of that ruling and the defendants' response were limited to whether (1) the submission was sufficiently detailed, (2) the defendants had properly asserted such privileges, and (3) such privileges properly applied.

The district judge never reached those issues. Instead, acting *sua sponte*, he reversed his order of June 6, 1978 granting the plaintiffs access to the Sovereignty Commission files and held that Miss. Code Ann. §§ 39–5–61 to –65 absolutely precluded discovery of the files. Second, drastical-

3. Section 1 of 1977 Miss. Laws Ch. 320 abolished the Commission. Sections 2, 4, and 5, codified in Miss. Code Ann. §§ 39–5–61 to –65 (Supp.1977), sealed the Commission's records. Section 39–5–61 provides:

> The files and equipment of the state sovereignty commission are hereby placed in the custody of the department of archives and history. Said files shall be immediately sealed, impounded and maintained as confidential files by the department of archives and history. Any equipment may be used by the department of archives and history in the furtherance of the activities of the said department. On July 1, 2027, such files shall become public records under the custody and control of the department of archives and history.

Section 39–5–63 provides:

> Any person who shall willfully break any seal containing the impounded files of the state sovereignty commission, or willfully examine, divulge, disseminate, alter, remove or destroy said files prior to July 1, 2027, shall, upon conviction, be fined not less than one thousand dollars ($1,000.00) nor more than five thousand dollars ($5,000.00) or imprisoned for not more than three (3) years, or punished by both such fine and imprisonment.

Section 39–5–65 provides:

> The department of archives and history shall conspicuously display the penalties prescribed by section 39–5–63 in one or more places on each container or cabinet in which the files of the state sovereignty commission are impounded.

4. The Mississippi Attorney General represented both the defendants and the non-party Director of Archives and History. At no point was any distinction drawn between their interests. We shall therefore refer to them collectively as "the defendants".

5. The "analysis" took the form of an eighty-two page, two-column list. The first column contained unexplained hyphenated numbers, presumably corresponding to particular documents. The second column contained mere one-word descriptions of the privilege asserted. The "analysis" did not identify, much less describe, the documents involved; the "analysis" did not explain the rationale for asserting a privilege with respect to each such document; and the "analysis" did not explain why, even if certain portions should be deleted to protect privileged material, the remainder of the document could not be released.

ly, the district judge dismissed all of the plaintiffs' claims as barred by the eleventh amendment—a contention which had not been raised by any party at any point during the two-year course of the litigation. Overlooking the fact that the claims for damages ran against the defendants in their individual capacities, rather than against the state fisc, the court held that the damage claims were "in essence, . . . for the recovery of money from the state" and therefore were barred. Without explanation, the district judge dismissed the plaintiffs' claims for injunctive and declaratory relief as well. Third, the court denied class certification, even though the plaintiffs had never moved for certification and an order staying certification proceedings pending further discovery was then in effect. As we understand the district judge's reasoning on this point, it appears that he thought that since the injunction and declaratory judgment claims were barred by the eleventh amendment, class certification should be denied as "unnecessary".

The plaintiffs filed their notice of appeal on May 1, 1979. In November 1979, the voters of Mississippi elected a new governor, attorney general, and secretary of state. After the new administration took office in January 1980, Governor William Winter appointed a new commissioner of public safety as well. By operation of Federal Rule of Appellate Procedure 43(c)(I) and Federal Rule of Civil Procedure 25(d)(I), these members of the new administration were automatically substituted as parties to this action to the extent that this suit was against the members of the outgoing administration in their "official capacities". Since the damage claims run against the individual members of the outgoing administration, they are still defendants as to those claims. Since the injunctive and declaratory relief requested by the defendants must run against the individuals currently in office, the members of the new administration are now the defendants as to those claims.

## II.

■ As the defendants' counsel conceded in the oral argument on appeal, the district court's dismissal of this action on the basis of the eleventh amendment was erroneous. That amendment only forbids suits against "one of the United States". A state official who acts in violation of the Constitution is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct" —that is, a lawsuit against him personally. *Ex parte Young*, 1908, 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714. Although the principle that an official who acts unlawfully may not claim the immunity of his sovereign if sued in his own name is today generally associated with *Ex parte Young*, its roots stretch deep into English common law, and it was applied specifically to avoid the bar of the eleventh amendment as early as *Osborn v. Bank of the United States*, 1824, 22 U.S. (9 Wheat) 738, 6 L.Ed. 204.[6] The theory underlying this principle—that in substance such a suit is not one against the state—is plainly fictitious. It is, nevertheless, a fiction " 'indispensable to the establishment of constitutional government and the rule of law' ". *Louisiana State Board of Education v. Baker*, 5 Cir. 1964, 339 F.2d 911, 914, *quoting* C. Wright, Federal Courts § 48, at 161 (1964). Like all valid legal fictions, it is an assumption made with a full realization of the impossibility of the thing assumed; a conceptual construct that has justified its existence by its success.[7]

**6.** *See* L. Jaffe, Judicial Control of Administrative Action 204–13, 235–39 (1965). Eleventh amendment cases antedating *Ex parte Young* that apply this principle in various forms are legion. *See* C. Jacobs, The Eleventh Amendment and Sovereign Immunity 99–105, 110–49 (1972). The true contribution of *Ex parte Young* to our constitutional jurisprudence was to confirm and generalize a development first enunciated in *Reagan v. Farmers Loan and Trust Co.*, 1894, 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014: it implied a new form of action directly from the Constitution, to restrain a newly-recognized constitutional tort—threatened prosecution under an unconstitutional state statute. *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 935 (2d ed. 1973).

**7.** *See* Jerome Frank, Law and the Modern Mind 312–22 (1935), discussing the validity of legitimate legal fictions, particularly as treated by Vaihinger ("The Philosophy of As If"), Torur-

Outside the specific context which inspired the adoption of the eleventh amendment—an action "in essence one for the recovery of money from the state", *Ford Motor Co. v. Department of Treasury*, 1945, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389— courts will pierce the fiction and apply the bar of the eleventh amendment to a suit nominally against individual state officers only in certain rare situations that are the legacy of quirks of legal evolution.[8]

The district court dismissed the damage claims on the strength of *Edelman v. Jordan*, 1974, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662. That was error. *Edelman* applied the principle laid down by *Ford Motor Co. v. Department of Treasury*: that the eleventh amendment forbids relief, however characterized, that is equivalent to an award of money damages for past injuries to be paid directly from the state fisc. The damage actions in this case, by contrast, are aimed at the individual members of the outgoing administration. This is, therefore, not a suit for damages against the State of Mississippi. Any money judgments awarded will run against the defendants personally. It is well established that such individual damage actions are not barred by the eleventh amendment. *E. g., Scheuer v. Rhodes*, 1974, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90; *In re Tyler*, 1893, 149 U.S. 164, 190, 13 S.Ct. 785, 792, 37 L.Ed. 689. We therefore reverse the district court's dismissal of the damage claims.

The district court offered no reason at all for dismissing the claims for injunctive and declaratory relief. If granted, that relief would operate prospectively; it would have nothing to do with damages or the award of retroactive benefits payable from the state treasury. Defendants concede that dismissal was not warranted at the time, but argue that the intervening change of administration brings those claims within the proscription of the eleventh amendment. They note that Federal Rule of Appellate Procedure 43(c)(1), the appellate analog of Federal Rule of Civil Procedure 25(d)(1), provides for automatic substitution of new public officers in litigation after a change of administration only for suits brought against the outgoing officers in their "official capacity".[9] But, they argue, circumvention of the bar of the eleventh amendment depends on the principle that suit may be brought against a state officer only in his personal capacity, not his official capacity. Hence, the argument runs, since Appellate Rule 43(c)(1) automatically brings the members of the new administration before the court only in their official capacity, the principle of *Ex parte Young* cannot apply and the suit must fail.

We reject this interpretation of Appellate Rule 43(c)(1) and Civil Rule 25(d)(1). What constitutes "official" action and what constitutes suit against a public officer in his "official" capacity may vary with the context in which the question is asked. It is well settled, for instance, that a public

---

toulon ("Philosophy in the Development of Law"), Jeremy Bentham, C. K. Ogden, and Morris Cohen. And *see* Fuller, *Legal Fictions* (pts. 1–3), 25 Ill.L.Rev. 363, 513, 865 (1930–31).

8. *E. g.*, where relief would be tantamount to specific enforcement of a contract against a state, *In re Ayers*, 1887, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216—although not where the complaint is framed directly in terms of violation of the contract clause, rather than in terms of breach of contract, *Georgia R. R. & Banking Co. v. Redwine*, 1952, 342 U.S. 299, 304–06, 72 S.Ct. 321, 324–25, 96 L.Ed. 335. The eleventh amendment was adopted in reaction against *Chisholm v. Georgia*, 1793, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440, in which the Supreme Court took original jurisdiction of an action by two South Carolina citizens to collect a debt owed them

by the State of Georgia. *See generally* C. Jacobs, *supra* note 6, at 54–74.

9. Civil Rule 25(d)(1) provides:
    When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution.
    Appellate Rule 43(c)(1) is only inconsequently different in wording.

officer's conduct can be sufficiently "official" to constitute state action within the meaning of the fourteenth amendment without at the same time being sufficiently "official" to trigger the bar of the eleventh amendment. *E. g., Home Telephone & Telegraph Co. v. City of Los Angeles*, 1913, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510. By the same token, there is no logical reason why a suit against a government official may not be against him in his personal capacity within the meaning of *Ex parte Young*, and yet still be "official" enough to require automatic substitution under Appellate Rule 43(c)(1) and Civil Rule 25(d)(1). Indeed, this is how the drafters of those Rules meant them to be interpreted. Otherwise, the main purpose of those Rules—to prevent the abatement of actions against public officers upon a change of administration—would be negated. As noted by the Rules Advisory Committee in its 1961 Note to Rule 25(d):

> The expression "in his official capacity" is to be interpreted in its context as part of a simple procedural rule for substitution; care should be taken not to distort its meaning by mistaken analogies to the doctrine of sovereign immunity from suit or the Eleventh Amendment. The amended rule will apply to all actions brought by public officers for the government, and to any action brought in form against a named officer, but intrinsically against the government or the office or the incumbent thereof whoever he may be from time to time during the action.... In general it will apply whenever effective relief would call for corrective behavior by the one then having official status and power, rather than one who has lost that status and power through ceasing to hold office.

Since in this case, the injunction and declaratory judgment claims must run against the incumbents, the action is "official" within the meaning of Appellate Rule 46(c)(1) and Civil Rule 25(d)(1); but the effect of those rules is automatically to bring the individual members of the new administration before the court in both their individual and official capacities within the meaning of *Ex parte Young*.[10]

We therefore reverse the district court's dismissal of the injunction and declaratory judgment claims. Because the court's denial of class certification was based on its dismissal of the underlying claims, we vacate that aspect of its judgment as well.

### III.

■ Next, we consider whether Miss. Code Ann. §§ 39–5–61 to –65 (Supp.1977) creates an evidentiary privilege compelling respect by a federal court trying a § 1983 action. The district judge was of the opinion that the statute did create an evidentiary privilege, and that federal courts are without power to override that privilege. Even though the statute does not explicitly create an evidentiary privilege, but merely provides in general terms for the confidentiality of the Sovereignty Commission's files, we are willing to assume, for the sake of argument, that Mississippi courts would construe the statute as creating a privilege. Nevertheless, we hold that that privilege should not be applied in this case.

Evidentiary privileges in federal courts are governed by Federal Rule of Evidence 501. Except "with respect to an element of a claim or defense as to which State law supplies the rule of decision", privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience". Since the only claims and defenses asserted here relate to federal § 1983 claims, the latter clause applies. Defendants therefore concede that under Rule 501, any privilege created by Miss.Code Ann. §§ 39–5–61 to –65 does not apply in federal court of its own force, and

---

**10.** *See* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1960, at 678–79 (1972). *Cf. Ex parte La Prade*, 1933, 289 U.S. 444, 53 S.Ct. 682, 77 L.Ed. 1311; *Allen v. Regents of University System of Georgia*, 1938, 304 U.S. 439, 444–45, 58 S.Ct. 980, 982–83, 82 L.Ed.

**1448.** Both of these cases construed more narrowly the statutory predecessor of Civil Rule 25(d)(1) and Appellate Rule 43(c)(1), Act of February 13, 1925, c. 229, § 11, 43 Stat. 941 (formerly codified at 28 U.S.C. § 780).

they do not challenge the constitutionality of that Rule. Instead, they ask us to find that privilege sufficiently compelling "in light of reason and experience" to be applied as a matter of federal common law.

■ When a litigant seeks to assert a privilege "not existent in the common law but enacted by the [state] legislature based on unique considerations of government policy", this Court, like other courts, has tested it by balancing the policies behind the privilege against the policies favoring disclosure. *Fears v. Burris Manufacturing Co.*, 5 Cir. 1971, 436 F.2d 1357, 1362; *Carr v. Monroe Manufacturing Co.*, 5 Cir. 1970, 431 F.2d 384, 388–89, *cert. denied*, 1971, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 1000.[11] This undifferentiated balancing test may usefully be refined by separating the questions: (1) whether the fact that the courts of Mississippi would recognize the privilege itself creates good reason for respecting the privilege in federal court, regardless of our independent judgment of its intrinsic desirability; and (2) whether the privilege is intrinsically meritorious in our independent judgment.

That the courts of a particular state would recognize a given privilege will not often of itself justify a federal court in applying that privilege. It is sometimes said that "a strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy". *United States v. King*, E.D.N.Y.1976, 73 F.R.D. 103, 105 (Weinstein, J.), *quoted in, e. g., Socialist Workers Party v. Grubisic*, 7 Cir. 1980, 619 F.2d 641, 643. But there is almost always such a cost to "the special federal interest in seeking the truth in a federal question case." *Carr v. Monroe Manufacturing Co.*, 5 Cir. 1970, 431 F.2d 384, 388, *cert. denied*, 1971, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 1000. In some cases, it is true, that interest may be weak. For example, when the substantive rule of decision is nominally federal but incorporates state law by reference, the federal interest in seeking the truth through rigorously independent federal procedures is slight.[12] Similarly, the federal interest may be slight when state-law issues predominate over federal issues in a case involving both, if there is a real danger of forum shopping.[13] Finally, disrespect for a state rule of privilege may be unnecessary if the litigants can obtain substantially the same evidence by an unprivileged route without undue hardship.

In this case, however, the federal interest in an independent evaluation of the claimed privilege is particularly strong. The purpose of enacting § 1983 was to ensure an independent federal forum for adjudication

11. *See, e. g., Socialist Workers Party v. Grubisic*, 7 Cir. 1980, 619 F.2d 641; *In re Grand Jury Impaneled (Freedman and Cortese)*, 3 Cir. 1976, 541 F.2d 373; *Lora v. Board of Education*, E.D.N.Y.1977, 74 F.R.D. 565 (Weinstein, J.); *United States v. King*, E.D.N.Y.1976, 73 F.R.D. 103 (Weinstein, J.). Cf. *Feminist Women's Health Center, Inc. v. Mohammed*, 5 Cir. 1978, 586 F.2d 530, 544 n.9 (dismissing claim of state privilege out of hand). *See generally* 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 501[03], at 501–33 to –34 (1980); Kaminsky, *State Evidentiary Privileges in Federal Civil Litigation*, 43 Fordham L.Rev. 923 (1975).

12. *See* H.R.Rep.No. 93–1597, 93d Cong., 2d Sess. 7–8, *reprinted in* [1974] U.S.Code Cong. & Ad.News 7098, 7100–01.

13. *But cf. Robinson v. Magovern*, W.D.Pa.1979, 83 F.R.D. 79, 84–85; *Lewis v. Capital Mortgage Investments*, D.Md.1978, 78 F.R.D. 295, 313. With little discussion, both of these cases refused to apply state-law privileges asserted for a piece of evidence relevant to both federal and state-law claims. The legislative history is equivocal on the weight to be given to state privilege law on such occasions. S.Rep.No.93–1277, 93d Cong., 2d Sess. 12 n.17, *reprinted in* [1974] U.S.Code Cong. & Ad.News 7051, 7059 n.17, which accompanied a somewhat different version of Rule 501, contemplated that the rules favoring reception of the evidence should apply. By contrast, the House report, which accompanied a proposal almost identical to the final Rule 501, was more sensitive to the problems of vertical forum shopping in such cases. H.R.Rep.No.93–650, 93d Cong., 2d Sess. 8–9, *reprinted in* [1974] U.S.Code Cong. & Ad.News 7075, 7082–83. The conference report is silent on this point. *Compare* 23 C. Wright & K. Graham, Federal Practice and Procedure § 5434, at 861–64 (1980), *with* 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 501[02] at 501–22 to –23 (1980).

of alleged constitutional violations by state officials; and, as we noted in *Carr*, there is a "special danger" in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged. 431 F.2d at 389.[14] Moreover, the information contained within the Sovereignty Commission's files cannot be obtained by any method other than examination of the files. Finally, we perceive no strong state interest in avoiding independent federal assessment of the privilege asserted here. It has been suggested that the reliance fostered by the creation of a state-law privilege might in itself be sufficient to limit federal divergence from that privilege. *See, e. g., Kaminsky, State Evidentiary Privileges in Federal Civil Litigation*, 43 Fordham L.Rev. 923, 941 (1975). Whatever merit that argument may possess in other contexts, it has none here, for the statute that created the privilege asserted here was passed long after the Sovereignty Commission files were created. Federal courts are therefore free in this case to assess the applicability of the privilege independent of the judgment of the Mississippi state legislature and state courts.[15]

Privileges are strongly disfavored in federal practice. *See, e. g., United States v. Nixon*, 1974, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039. This Court adopted Wigmore's classic utilitarian formulation of the conditions for recognition of a testimonial privilege in *Garner v. Wolfinbarger*, 5 Cir. 1970, 430 F.2d 1093, *cert. denied*, 1971, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323:

(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality* must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered*.

(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

Only if these four conditions are present should a privilege be recognized. *Id.* at 1100, *quoting* 8 J. Wigmore, Evidence § 2285, at 527 (McNaughton rev. 1961). As a general rule, we defer to the discretion of the trial judge in applying this test. *Fears v. Burris Manufacturing Co.*, 5 Cir. 1971, 436 F.2d 1357, 1362; *Carr v. Monroe Manufacturing Co.*, 5 Cir. 1970, 431 F.2d 384, 389, *cert. denied*, 1971, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed.2d 1000. A remand is unnecessary in this case, however, because the blanket privilege asserted for the Sovereignty Commission's files meets none of the four criteria. All of the files were created long before the enactment of Miss.Code Ann. § 39–5–61 to –65 in 1977 accorded them confidentiality. During the years of its activity, the files were open to all members of the Mississippi legislature. *See* Miss. Code Ann. § 3–1–15 (1972). Even more tellingly, the state has failed to explain how nonrecognition of a blanket privilege for the files of a defunct state agency might hamper current or future government operations— the only possible justification for privilege in this context. Even the files of active law enforcement agencies lose their privileges after particular investigations become complete.[16] The defendants' brief forthrightly

14. *See also Lora v. Board of Education*, E.D.N.Y.1977, 74 F.R.D. 565, 579 ("Only strong countervailing public policies should be permitted to prevent disclosure when, as here, a suit is brought to redress a claim for violation of civil rights under the Constitution.").

15. Defendants suggest that since the assumed state-law privilege has its origin in a statute, rather than in Mississippi common law, it should be entitled to more respect by federal courts. Under *Erie R. R. Co. v. Tompkins*, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, however, a federal court should give equal respect to state legislatures and state courts as enunciators of state policy.

16. *Brown v. Thompson*, 5 Cir. 1970, 430 F.2d 1214, 1215–16; *Swanner v. United States*, 5 Cir. 1970, 406 F.2d 716, 718–19. *See generally* Note, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum.L.Rev. 142, 157–60 (1976).

admits that the files are "potentially inflammatory", and asks us to hold that "[t]he state has a justifiable and compelling interest in allowing old wounds to heal". This appealing argument carries little weight when it is at the expense of a litigant relying on federal constitutional rights, claiming damages for past injury and alleging that the injury is continuing. We do not have the power to forgive and forget. To the extent that this state interest is affected, it can be accommodated by the issuance of an appropriate protective order.[17] *See, e. g., Jepson v. Florida Board of Regents,* 5 Cir. 1980, 610 F.2d 1379, 1384; *Carr v. Monroe Manufacturing Co.,* 5 Cir. 1970, 431 F.2d 389, 390, *cert. denied,* 1971, 400 U.S. 1000, 91 S.Ct. 456, 27 L.Ed. 1000.

We therefore reverse the district court's order to the extent that it holds that Miss. Code Ann. 39–5–61 to –65 (Supp.1977) renders the Sovereignty Commission files privileged from production in federal court.

## IV.

■ The defendants who currently hold office contend that the change of administration in Mississippi since this appeal was filed moots the claims for injunctive and declaratory relief against them. Relying on *Spomer v. Littleton,* 1974, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 and *Mayor of Philadelphia v. Educational Equality League,* 1979, 415 U.S. 605, 622–23, 94 S.Ct. 1323, 1334–35, 39 L.Ed.2d 630, they argue that since the complaint does not seek relief against them by name and does not in terms state that the unconstitutional practices alleged were a policy of the State of Mississippi, or that the current officials will

continue those practices, it does not sufficiently state a live controversy between the plaintiffs and them.[18] The plaintiffs maintain in their briefs and in argument on appeal that the unconstitutional practices they challenge are continuing and will continue unless enjoined, despite the change of administration, and they argue that their complaint sufficiently states that position.

A change of administration can affect an action for prospective injunctive or declaratory relief in at least three analytically distinct ways.[19] First, the action may become moot in the Article III sense of failing to present a justiciable "case or controversy". *See, e. g., Spomer v. Littleton,* 1974, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 684. Second, because mootness in this context is determined by reference to the allegations of the complaint, 414 U.S. at 522 n.10, 94 S.Ct. at 689 n.10, the complaint may not sufficiently plead a controversy against the members of the new administration even though one may actually exist, and even though those individuals were automatically substituted into the action by Civil Rule 25(d)(1) or Appellate Rule 43(c)(1). Third, even if those two threshold factors do not prevent the case from being tried on the merits, a court may not exercise its equitable discretion to grant prospective injunctive relief against the successors without a strong factual basis—apart from the mere allegations of the complaint—for concluding that they will continue the illegal practices of their predecessors. *See Mayor of Philadelphia v. Educational Equality League,* 1979, 415 U.S. 605, 622–23, 94 S.Ct. 1323, 1334–35, 39 L.Ed.2d 630; *Two Guys*

17. We have no occasion to rule on the propriety of any such protective order here, however. *Cf. In re Halkin,* D.C.Cir. 1979, 598 F.2d 176, noted in Comment, *The First Amendment Right to Disseminate Discovery Materials,* 92 Harv.L. Rev. 1550 (1979).

18. The defendants also suggest that the dissolution of the Sovereignty Commission in 1977 moots the case. The plaintiffs do not contend that the Sovereignty Commission was the sole or even primary vehicle for the unconstitutional intrusions they allege, however; its demise therefore is irrelevant to the question of mootness.

19. *See, e. g., Ciudanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners,* 5 Cir. 1980, 622 F.2d 807; *Tara Enterprises v. Humble,* 8 Cir. 1980, 622 F.2d 400; *Network Project v. Corporation for Public Broadcasting,* D.C.Cir.1977, 561 F.2d 963; *Sarteschi v. Borlein,* 3 Cir. 1975, 508 F.2d 110. *See generally* Comment, *Substitution under Federal Rule 25(d): Mootness and Related Problems,* 43 U.Chi.L.Rev. 192 (1975); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533, at 282–91 (1975).

*from Harrison-Allentown, Inc. v. McGinley,* 1961, 366 U.S. 582, 588–89, 81 S.Ct. 1135, 1138–39, 6 L.Ed.2d 551.[20]

If we could construe this complaint as alleging that the members of the new administration are actually continuing the unconstitutional practices of their predecessors, the action would not be moot in the sense of Article III. Even if the practices have presently ceased, the case will still not be moot unless the defendants can demonstrate that "there is no reasonable expectation that the wrong will be repeated". *United States v. W. T. Grant Co.,* 1953, 345 U.S. 629, 633, 73 S.Ct. 893, 894, 97 L.Ed. 1303, *quoting United States v. Aluminum Co. of America,* 2 Cir. 1945, 148 F.2d 416, 488. In matters involving public rights, that standard is a high one. "[T]o say that the case has become moot means that the defendant is entitled to dismissal as a matter of right. *N.L.R.B. v. General Motors Corp.,* 179 F.2d 221 (1950 C.A.2d). The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement." 345 U.S. at 632, 73 S.Ct. at 897.[21]

■ We cannot, however, read this complaint as explicitly or even implicitly pleading that the members of the new administration will continue the unlawful practices of the old. It is true that complaints should be construed with more than the usual liberality in this regard. Civil Rule 25(d)(1) was amended to its present form in 1961 to end the older practice which placed on the plaintiff the duty to move specifically for substitution of official defendants within a limited period of time, on pain of dismissal. Since a plaintiff would have to be exceptionally foresighted to put in his initial complaint specific allegations that any successor to the original official defendant will continue the challenged practice or that the practice is a policy of the office, courts should freely imply such an allegation where plaintiffs have "supplied factual allegations from which the continuation of the dispute is a reasonable inference". *Ciudanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners,* 5 Cir. 1980, 622 F.2d 807, 822. Otherwise, the automatic substitution rules would lose much of their utility. Here, although the plaintiffs allege in general terms that the illegal activities they challenge began as early as 1964, long before the members of the outgoing administration first assumed office, the only specific incidents mentioned in the complaint involved members of the outgoing administration.[22] There is therefore no basis for construing the complaint to allege by implication that the challenged activities were a matter of state policy or a recurrent practice of Mississippi executive officials, rather than idiosyncratic abuses of the par-

**20.** *Mayor of Philadelphia v. Educational Equality League,* 1979, 415 U.S. 605, 622–23, 94 S.Ct. 1323, 1334–35, 39 L.Ed.2d 630, cited *Spomer v. Littleton,* 1974, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694, for this proposition without explanation. But *Spomer* only dealt with the effect of voluntary cessation on justiciability and with the construction of pleadings in such cases. These issues are analytically distinct from the relationship between voluntary cessation and the propriety of prospective injunctive relief. Voluntary cessation may make injunctive relief unjustifiable without at the same time rendering the claim nonjusticiable. *United States v. W. T. Grant Co.,* 1953, 345 U.S. 629, 633, 73 S.Ct. 893, 894, 97 L.Ed. 1303; *United States v. Concentrated Phosphate Export Ass'n,* 1968, 393 U.S. 199, 202–04, 89 S.Ct. 361, 363–65, 21 L.Ed.2d 394. *–See also Familias Unidas v. Briscoe,* 5 Cir. 1976, 544 F.2d 182, 188. *But cf.* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler,

Hart and Wechsler's The Federal Courts and the Federal System 110 (2d ed. 1973) ("an action for an injunction ... does not become moot merely because the conduct immediately complained of has terminated, if there is a possibility of a recurrence which would be within the terms of a proper decree.").

**21.** *See, e. g., SEC v. Medical Comm. for Human Rights,* 1972, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560; *Ciudadanos Unidos de San Juan v. Hidalgo County Grand Jury Commissioners,* 5 Cir. 1980, 622 F.2d 807, 824–25; *Familias Unidas v. Briscoe,* 5 Cir. 1976, 544 F.2d 182, 187–88. *See generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533, at 266–67, 282–91 (1975); Note, *The Mootness Doctrine in the Supreme Court,* 88 Harv.L.Rev. 373, 380–86 (1974).

**22.** *See* note 1 *supra.*

ticular members of the outgoing administration. *See Spomer v. Littleton*, 1974, 414 U.S. 514, 521, 94 S.Ct. 685, 689, 38 L.Ed.2d 694. The general allegation that the plaintiffs "will continue to be subjected to Defendants' unlawful governmental intrusions unless Defendants are enjoined", made when the members of the old administration were the only defendants, is also insufficient to support any such inference.

Though their present complaint is insufficient, the plaintiffs argue on appeal that their position is that the new administration will continue the practices of the old, or that there is at least a reasonable expectation that the alleged wrongs will be repeated. The flexible Federal Rules of Civil Procedure do not require litigants to be thrown out of court when their pleadings are technically deficient. Rule 15(d) is particularly apt for cases where an intervening change in administration renders ambiguous a complaint seeking prospective relief against public officers. That Rule permits a party, "upon such terms as are just", to "serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of pleading sought to be supplemented". The interests of justice require that the plaintiffs be permitted to file such a supplemental pleading. If they do not do so within a reasonable time, their claims for prospective relief must be dismissed as moot.

The judgment is reversed and this case is remanded for proceedings in conformity with this opinion.