IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 97-30320

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

FRANK SMITH,

Defendant,

TAYLOR HENRY;
WDSU-TELEVISION INC.,

Movants-Appellees.

———————————————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————————————

February 23, 1998

Before POLITZ, Chief Judge, HIGGINBOTHAM and DeMOSS, Circuit
Judges.

HIGGINBOTHAM, Circuit Judge:

The government appeals from a district court order quashing a subpoena compelling the production at a criminal trial of a videotape recording of an interview of the defendant by a local television station. The district court held that the newsreporters' qualified privilege protected from disclosure to the government of unaired portions of the interview conducted by Taylor Henry on behalf of WDSU-Television, Inc. Finding that there is no privilege under the circumstances of this case, we vacate the district court's order and remand for further proceedings.

I.

On March 21, 1996, two successive fires destroyed the MacFrugal's Regional Distribution Center in New Orleans, Louisiana. After federal agents spoke with him, Frank Smith, an employee at the center, became aware that he was under suspicion for setting the fires. On March 27, 1996, Smith contacted WDSU-TV and represented that he had information regarding the cause of the fires. That day, Taylor Henry, a reporter with WDSU-TV, videotaped his interview with Smith. During the interview, Smith accused others of burning down the structure.

Later that same day, Smith met with New Orleans Fire Department Superintendent Warren McDaniels. Superintendent McDaniels, with Smith's consent, tape recorded their conversation. Smith informed Superintendent McDaniels that after the first fire occurred, he overheard the manager and assistant manager of the distribution center plotting to set the second blaze, at the direction of the MacFrugal's Corporate Office in California. Superintendent McDaniels later provided his tape recording to the government.

The next day, the Bureau of Alcohol, Tobacco, and Firearms also interviewed Smith. Again, Smith repeated his story about overhearing a plot to set the second fire, but the version of events he gave to the BATF differed slightly from the one he provided to Superintendent McDaniels.

2

On April 2, 1996, the government arrested Smith on charges that he had set the first of the two fires. Following his arrest, WDSU-TV televised a small portion of its interview with Smith. In the ten second segment aired on television, Smith claimed that he overheard the manager and assistant manager of the distribution center plotting to set the second fire. Smith's face was obscured in the footage, but he was identified by name. On April 26, 1996, a grand jury indicted Smith and charged him with setting the first of the two fires at the distribution center. By this time, the BATF had determined that an electrical overload had caused the second fire, not arson. The BATF's conclusion, of course, rendered suspicious Smith's assertions that he had overheard a plot to set the second fire.

The government decided that it wanted as evidence the entire WDSU-TV interview, hoping that it would contain more of Smith's allegedly false accusations. On April 23, 1996, the government requested that WDSU-TV provide it with a copy of both the televised and untelevised portions of the interview. WDSU-TV expressed a general willingness to cooperate with the prosecution, but it refused to turn over any footage to the government absent a subpoena. The government then obtained a subpoena for the aired portion of the interview, with which WDSU-TV complied.

To procure a subpoena for the untelevised portions of the videotape, the Attorney General's Guidelines required the prosecutors first to obtain the Attorney General's authorization.

3

On May 16, 1996, after receiving the necessary approval, the government filed a motion asking the district court to issue a Rule 17(c) subpoena to Taylor Henry and WDSU-TV (collectively WDSU-TV hereinafter) for the untelevised portion of their interview videotape. Believing that the videotape might contain exculpatory evidence, Smith later joined the government's subpoena request.

WDSU-TV responded by moving to quash the subpoena on First Amendment grounds, claiming a newsreporters' privilege. On July 2, 1996, the district court issued an order granting WDSU-TV's motion, citing WDSU-TV's First Amendment rights. On July 24, 1996, the government filed notice of interlocutory appeal from the court's order. However, on October 22, 1996, the government agreed to a request by WDSU-TV to dismiss its appeal without prejudice, so that the district court could inspect the videotaped interview <u>in camera</u>. After doing so, the district court entered a second order on February 25, 1997, confirming its initial decision to quash the subpoena. The court ruled that the government's interest in the interview was not sufficient to defeat WDSU-TV's qualified privilege, as the videotape contained evidence that was cumulative of what the government already possessed. On March 21, 1997, the government reinstated its original appeal. Although Smith originally joined in the government's subpoena request, he neither joined nor opposed any of its appeals.

## II.

4

Before reaching the merits of the district court's order, we must first consider our jurisdiction. WDSU-TV asserts that the government may not appeal from the district court's order quashing the subpoena. It argues both that the order was not an appealable final order under 28 U.S.C. § 1291 and that the government may not avail itself of the appellate route set forth in 18 U.S.C. § 3731. We need not reach WDSU-TV's § 1291 argument, however, because we find jurisdiction to entertain this appeal pursuant to § 3731.

Title 18, U.S.C. § 3731, permits the United States to appeal orders "suppressing or excluding" evidence in criminal cases so long as the relevant United States Attorney "certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731. The government must take its appeal under § 3731 within thirty days of the district court order being challenged. See id.

We have little difficulty concluding that § 3731 affords the government a basis for an appeal. Section 3731 provides the government with as broad a right to appeal as the Constitution will permit. See United States v. Wilson, 420 U.S. 332, 337 (1975). Here, the district court's order quashing the WDSU-TV subpoena is a ruling that effectively "suppress[es] or exclud[es] evidence . . . in a criminal proceeding," as the district court denied the government the videotaped evidence on the basis of privilege. Furthermore, Smith's allegedly false allegations contained in the

5

videotape make it "substantial proof of a fact material in the proceeding." Finally, the government's appeal certainly was not brought for "the purpose of delay," as the defendant has in no way opposed the appeal or complained about delay.

WDSU-TV, however, contends that the government's appeal under § 3731 was untimely. The district court entered its first quashing order on July 2, 1996. Pursuant to § 3731, the government certified its appeal from that order, but it did not do so until October 21, 1996, as it was confused about the statutory basis for its appeal. Upon WDSU-TV's request, the government voluntarily dismissed its first appeal without prejudice to its reinstatement, to allow the district court to review the videotaped evidence in camera. After the district court again quashed the subpoena following the in camera inspection, the government reinstated its original appeal. However, it did not file a new certificate. Hence, WDSU-TV claims that the government is now barred from appealing under § 3731, as the government missed the thirty-day certification deadline following both court orders.

As we have previously stressed, § 3731's timing requirements are not jurisdictional; we may still entertain § 3731 appeals certified in an untimely manner. See United States v. Crumpler, 507 F.2d 624, 624 (5th Cir. 1975). Whether the government met the thirty-day time limit is relevant only in considering the "equities" of its appeal. See United States v. Miller, 952 F.2d

6

866, 875 (5th Cir.), cert. denied, 505 U.S. 1220 (1992). We find that the equities here all lie in the government's favor.

First, the government effectively complied with the thirty-day time limit in its appeal from the second district court order. As the statute instructs, before appealing the first time the government considered whether its appeal would delay justice and whether it sought substantial proof of a material fact. Although the district court later ruled that the videotaped evidence was cumulative, the government in its reinstated appeal need not have reconsidered its appellate strategy in light of the district court's decision. Rather, the government was entitled to maintain its position that it was seeking important evidence for non-dilatory purposes. The reinstated appeal was filed within thirty days of the second district court order. Thus, we view the government's reinstated appeal as incorporating the proper, but untimely, § 3731 certification from its first appeal.

Second, the purpose of § 3731's thirty-day appellate deadline is to prevent the government from denying a speedy trial to a defendant by needlessly appealing evidentiary rulings. See United States v. Herman, 544 F.2d 791, 794 (5th Cir. 1977). The defendant therefore is the person that might be harmed by the government's stalling tactics, not a third party in possession of evidence. Here, the defendant himself joined in the government's subpoena for the videotape and has not opposed this appeal, so presumably he is not concerned about delay.

7

Thus, the equities in this appeal favor the government. The government effectively complied with the time limit in the statute. To the extent that the government did not follow the precise letter of the law, the defendant, the person meant to be protected by § 3731, suffered no harm. Accordingly, we find it appropriate to exercise appellate jurisdiction under 18 U.S.C. § 3731.

## III.

The district court held that reporters possess a qualified privilege not to divulge nonconfidential information in criminal cases. It based this conclusion on a reading of our major pronouncement on the newsreporters' privilege, Miller v. Transamerican Press, 621 F.2d 721, 725 (5th Cir. 1980), cert. denied, 450 U.S. 1041 (1981), and on precedents from other circuits. Applying the privilege after an in camera inspection of the evidence, the court determined that the government was not entitled to the videotape outtakes, as they were cumulative of what the government already had in its possession. We find, however, that the district court erred in granting WDSU-TV a privilege under these circumstances.

Any discussion of the newsreporters' privilege must start with an examination of Branzburg v. Hayes, 408 U.S. 665 (1972), the Supreme Court's most detailed exposition on the subject. In Branzburg, various grand juries subpoenaed newsreporters and ordered them to testify as to the identity of the confidential sources for their stories. The newsreporters refused to comply

8

with the subpoenas, citing the First Amendment. The Supreme Court, however, rejected their freedom-of-the-press argument, concluding that newsreporters have the same obligation to testify before a grand jury as any other citizen. See id. at 690. Although the Court recognized that it would be a burden, albeit an "uncertain" one, for newsreporters to reveal their sources, it held that the public's interest in law enforcement outweighed the concerns of the press. See id. at 690-91. Consequently, the Court explicitly rejected a qualified newsreporters' privilege shielding confidential source information from grand juries. See id. at 702-08. The Court instructed that the needs of the press are not to be weighed against the needs of the government in considering grand jury subpoenas. See id. at 705-06.

Although the opinion of the Branzburg Court was joined by five justices, one of those five, Justice Powell, added a brief concurrence. For this reason, we have previously construed Branzburg as a plurality opinion. See In re Selcraig, 705 F.2d 789, 793 (5th Cir. 1983) (analyzing Branzburg). In his concurring opinion, Justice Powell stated:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

Branzburg, 408 U.S. at 710 (Powell, J., concurring).

Although some courts have taken from Justice Powell's concurrence a mandate to construct a broad, qualified newsreporters' privilege in criminal cases, see, e.g., United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988); United States v. Cuthbertson, 630 F.2d 139, 147 (3d Cir. 1980), cert. denied, 449 U.S. 1126 (1981), we decline to do so. Justice Powell's separate writing only emphasizes that at a certain point, the First Amendment must protect the press from government intrusion. To Justice Powell, however, that point occurs only when the "grand jury investigation is not being conducted in good faith." Branzburg, 408 U.S. at 710 (Powell, J., concurring). Justice Powell reasoned that "if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash." Id. Justice Powell had in mind the "harassment of newsmen." Id. at 709; see also In re Grand Jury Proceedings, 5 F.3d 397, 401 (9th Cir. 1993) (reading Branzburg and concluding that Justice Powell meant only to protect newsreporters from intentional harassment by the government), cert. denied, 510 U.S. 1041 (1994); In re Grand Jury Proceedings, 810 F.2d 580, 587-88 (6th Cir. 1987) (same). In the end, Justice Powell's concurrence highlighted a limit on the government's subpoena power also recognized by the plurality opinion. See

10

<u>Branzburg</u>, 408 U.S. at 699-700 (noting that the Court was not reaching the question of an abusive grand jury investigation). It did not argue for a general qualified privilege for newsreporters in criminal cases.[1] A single subpoena issued only after considered decision by the Attorney General of the United States to compel production of evidence at a federal trial of a multicount felony indictment is no harassment. Calling it such presupposes a clear privilege. On the facts, that is not this case.

WDSU-TV is not here seeking a privilege against disclosing confidential source information, which the Court rejected in <u>Branzburg</u>. Rather, it argues that journalists deserve a qualified privilege in their nonconfidential work product, so as to protect the media as an institution. According to WDSU-TV, such a privilege would be akin to the attorney work-product privilege, designed to promote effective representation of clients, and the executive privilege, intended to aid the operation of the executive branch. WDSU-TV argues that it deserves a similar, "institutional"

---

[1]Subsequent statements by the Supreme Court and individual justices confirm this understanding of <u>Branzburg</u>. <u>See</u> <u>University of Pa. v. EEOC</u>, 493 U.S. 182, 201 (1990) ("In <u>Branzburg</u>, the Court rejected the notion that under the First Amendment a reporter could not be required to appear or to testify as to information obtained in confidence without a special showing that the reporter's testimony was necessary."); <u>New York Times, Co. v. Jascalevich</u>, 439 U.S. 1301, 1302 (1978) (White, J., in chambers) (denying stay) ("There is no present authority in this Court that a newsman need not produce documents material to the prosecution or defense of a criminal case, or that the obligation to obey an otherwise valid subpoena served on a newsman is conditioned upon the showing of special circumstances.") (citation to <u>Branzburg</u> omitted).

11

privilege, because even the disclosure of nonconfidential information to the government can unduly burden its First Amendment rights. It contends that absent a privilege, prosecutors will "'annex' the news media as 'an investigative arm of government.'" Branzburg, 408 U.S. at 709 (Powell, J., concurring). On this theory, future news-sources will be wary of the media's close connection to the government, so they will hesitate before approaching reporters, even for on-the-record interviews. In addition, WDSU-TV argues that without a privilege, the media will be swamped with criminal discovery requests. Having to respond to these requests would hamper the media's ability to provide the public with newsworthy information. As a result, contends WDSU-TV, rather than comply with future demands for evidence, the media might instead simply destroy its work product once it was printed or aired, thereby depriving itself of valuable archival material. Alternatively, WDSU-TV fears that the press might hesitate before reporting on important matters that could get it enmeshed in criminal litigation.[2]

---

[2]Several circuits have considered similar arguments and extended the newsreporters' privilege to nonconfidential work product, either in civil or criminal cases. See Shoen v. Shoen, 5 F.3d 1289, 1294-95 (9th Cir. 1993) (civil case); LaRouche Campaign, 841 F.2d at 1182 (criminal case); von Bulow v. von Bulow, 811 F.2d 136, 143 (2d Cir.) (implying applicability in civil cases), cert. denied, 481 U.S. 1015 (1987); Cuthbertson, 630 F.2d at 147 (criminal case). On the other hand, at least one circuit has tacitly rejected a reporter's privilege in a criminal case where the information sought was nonconfidential. See In re Shain, 978 F.2d 850, 853 (4th Cir. 1992).

12

We find little support in either the plurality or the concurring opinions of <u>Branzburg</u> for the sort of privilege that WDSU-TV asks us to recognize.[3]  The newsreporters in <u>Branzburg</u> argued compellingly as to how forcing them to divulge confidential source information might ruin their ability to procure news in the future.  It is not difficult to imagine why confidential sources would be reluctant to approach the media if they knew that the press could be compelled to disclose their identities.  Despite the newsreporters' strong First Amendment arguments, however, the <u>Branzburg</u> Court rejected their call for a privilege.  Here, on the other hand, the danger that sources will dry up is less substantial.  WDSU-TV seeks to protect only nonconfidential information obtained from a person who wanted it aired when he gave it and joined the government in seeking its production at trial. It is not the "rights" of the informant that are here at issue. Rather it is the rights of the newsmen.  So it is that the press argues here that there is an interview effect in terrorem, a chilling.  Relatedly, the press argues that the burdens will grow if this discovery is ordered because it will make the press an arm

---

[3]In reaching this conclusion, we consider only the interests of the government in promoting effective law enforcement.  Smith also may have a Sixth Amendment interest in the outtakes to permit him to conduct an effective defense.  Because Smith did not join in the government's appeal, however, the government cannot assert and we cannot rely upon Smith's rights.  <u>See</u> <u>United States v. Fortna</u>, 796 F.2d 724, 732 (5th Cir.) (holding that Sixth Amendment rights of a defendant cannot be asserted vicariously), <u>cert. denied</u>, 479 U.S. 950 (1986).

13

of the prosecution.  Yet there is little reason to fear that on-the-record sources will avoid the press simply because the media might turn over nonconfidential statements to the government. Presumably, on-the-record sources expect beforehand that the government, along with the rest of the public, will view their nonconfidential statements when they are aired by the media.  WDSU-TV's fears that nonconfidential sources will shy away from the media because of its unholy alliance with the government are speculative at best.

The other policy rationales advanced by WDSU-TV for a nonconfidential information privilege are similarly unpersuasive. Responding to discovery may well take valuable time, decreasing to that extent resources available for newsreporting.  Yet in the immediate sense, the press here is not differently situated from any other business that may find itself possessing evidence relevant to a criminal trial.  It has a relevant and protectible interest in not being unduly burdened, as, for example, by overly broad subpoenas for large amounts of data of dubious relevance. But this burden is case specific.  Not surprisingly, the Supreme Court has consistently refused to exempt the media from the reach of generally-applicable laws, simply because those laws might indirectly burden its newsgathering function.  See, e.g., Oklahoma Press Publ'g Co. v. Walling, 327 U.S. 186, 192-94 (1946) (applying Fair Labor Standards Act to the media, over First Amendment

14

objection); <u>Associated Press v. United States</u>, 326 U.S. 1, 7 (1945) (applying Sherman Act to the media, over First Amendment objection); <u>Associated Press v. NLRB</u>, 301 U.S. 103, 132-33 (1937) (applying National Labor Relations Act to the media, over First Amendment objection); <u>Grosjean v. American Press Co.</u>, 297 U.S. 233, 250 (1936) (holding that the media is subject to nondiscriminatory forms of taxation). We are pointed to no empirical basis for assertions that the media will avoid important stories or destroy its archives in response to rare requests for criminal discovery. Indeed, in holding that the press is not exempt from government searches and seizures, the Supreme Court considered and rejected policy arguments parallel to those asserted here by WDSU-TV. <u>See</u> <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547, 563-67 (1978).

WDSU-TV, however, attempts to escape from the balance <u>Branzburg</u> struck between the public's interest in effective law enforcement and the press's First Amendment rights by arguing that the <u>Branzburg</u> decision only applies to grand jury proceedings, not the trial setting we have before us now. <u>See, e.g.</u>, <u>Riley v. City of Chester</u>, 612 F.2d 708, 714 (3d Cir. 1979) (limiting <u>Branzburg</u> to grand jury context). Although the district court agreed with WDSU-TV, we find little persuasive force in this distinction. Surely the public has as great an interest in convicting its criminals as it does in indicting them. As the Supreme Court has stated in the context of the executive privilege: "The right to the production of all evidence at a criminal trial . . . has constitutional

15

dimensions. . . . [T]he allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of the law and gravely impair the basic function of the courts." United States v. Nixon, 418 U.S. 683, 711-12 (1974). Moreover, the Branzburg Court gave no indication that it meant to limit its holding to grand jury subpoenas:

> On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation *or criminal trial*.

Branzburg, 408 U.S. at 690-91 (emphasis added).

Branzburg will protect the press if the government attempts to harass it. Short of such harassment, the media must bear the same burden of producing evidence of criminal wrongdoing as any other citizen. As the Supreme Court has admonished, evidentiary privileges are generally disfavored in the law. See Herbert v. Lando, 441 U.S. 153, 175 (1979). We see no reason to create a new one here and compelling reasons not to do so.

IV.

Thus, we find that Branzburg precludes the form of privilege recognized by the district court and urged on us by WDSU-TV. Nevertheless, WDSU-TV contends that our panel need not consider the merits of a new privilege, for we are bound to apply one already

16

established by our court in <u>Miller v. Transamerican Press, Inc.</u>, 621 F.2d 721 (5th Cir. 1980), <u>cert. denied</u>, 450 U.S. 1041 (1981). In <u>Miller</u>, we held that in civil libel suits, reporters possess a qualified privilege not to disclose the identity of confidential informants. To defeat this privilege, the discoverer must show that: 1) the information is relevant; 2) it cannot be obtained by alternative means; and 3) there is a compelling interest in the information. <u>See</u> <u>id.</u> at 726. <u>Miller</u> concluded that this privilege was justified because the balance of interests favored the press in civil libel cases, unlike the grand jury proceedings considered in <u>Branzburg</u>. <u>See</u> <u>id.</u> at 725. In <u>In re Selcraig</u>, 705 F.2d 789, 792 (5th Cir. 1983), we iterated the existence of the newsreporters' privilege. We held in <u>Selcraig</u> that "the first amendment shields a reporter from being required to disclose the identity of persons who have imparted information to him in confidence," but that this privilege can be overcome in civil libel cases. <u>Id.</u> at 792.[4]

We disagree with WDSU-TV that <u>Miller</u> controls this case, as the <u>Miller</u> privilege differs from the privilege sought here in two critical respects. First, <u>Miller</u> was a civil matter, while we have before us a criminal prosecution. The <u>Branzburg</u> Court emphasized that the public's interest in effective law enforcement outweighed the press's entitlement to a First Amendment privilege against the

_____

[4]Other courts have agreed with ours and recognized a qualified reporter's privilege in civil cases. <u>See, e.g.</u>, <u>Zerilli v. Smith</u>, 656 F.2d 705, 711-12 (D.C. Cir. 1981); <u>Silkwood v. Kerr-McGee Corp.</u>, 563 F.2d 433, 437 (10th Cir. 1977).

17

disclosure of information. See Branzburg, 408 U.S. at 690. Because the public has much less of an interest in the outcome of civil litigation, in civil cases like Miller the interests of the press may weigh far more heavily in favor of some sort of privilege. Cf. Zerilli v. Smith, 656 F.2d 705, 711 (D.C. Cir. 1981) ("Although Branzburg may limit the scope of the reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective criminal law enforcement is absent, that case is not controlling.").

The second important difference between this case and Miller relates to confidentiality. As we have previously noted in the context of testimonial privileges, the existence of a confidential relationship that the law should foster is critical to the establishment of a privilege. See ACLU v. Finch, 638 F.2d 1336, 1344 (5th Cir. Unit A Mar. 1981). Both Miller and Selcraig recognized privileges meant to protect newsreporters from unnecessarily revealing the identities of confidential sources. Here, however, the confidentiality issue is absent. As we have observed, WDSU-TV interviewed Smith "on the record," so there was no expectation between Smith and the television station that any of the information he provided was to be kept in confidence. Indeed, the lower court was faced with the polar opposite of confidentiality: WDSU-TV refused to produce to Smith his own statements given to the television station on the record. We have

18

never recognized a privilege for reporters not to reveal nonconfidential information. In fact, this court has theorized that confidentiality is a prerequisite for the newsreporters' privilege. See Pressey v. Patterson, 898 F.2d 1018, 1022 n.4 (5th Cir. 1990) ("Although the question is not directly before us, we have strong doubts whether the trial judge was correct in enforcing this privilege insofar as these tapes were concerned. As far as we can discern from the record, Resier was a divulged source, not a confidential source.").

We conclude that newsreporters enjoy no qualified privilege not to disclose nonconfidential information in criminal cases. Therefore, we pay no heed to the district court's determination, both before and after its in camera inspection of the videotape, that the requested evidence was cumulative of the defendant's statements already possessed by the government. As WDSU-TV enjoys no privilege here, the district court need never have conducted an in camera inspection. Likewise, the district court's pre-inspection conclusion that the videotape outtakes were cumulative cannot be disentangled from its rulings regarding privilege. Regardless, the district court's orders reflect a balancing of relevance against a found protected interest under the First Amendment. There is no finding that meeting the calls of the subpoena will be burdensome. Rather, the district court concluded that the government lacked *sufficient* need. However, absent a

privilege, the government's burden in requesting the subpoena was to demonstrate that the evidence sought was relevant, that it was admissible, and that it had been identified with adequate specificity.  See United States v. Arditti, 955 F.2d 331, 345 (5th Cir.), cert. denied, 506 U.S. 998 (1992).  Multiple contradictory stories told by a defendant can demonstrate a consciousness of guilt.  See, e.g., United States v. Simone, 205 F.2d 480, 482 (2d Cir. 1953) (permitting inference of guilt from defendants' contradictory statements given in four interviews with government agents).  The subpoenaed evidence was relevant and not cumulative. Accordingly, the government satisfied its Rule 17(c) burden and is entitled to the videotapes.

V.

The order of the district court quashing the subpoena of WDSU-TV and Taylor Henry is vacated and this case is remanded for further proceedings.

VACATED AND REMANDED.

20