79 F.3d 346
 24 Media L. Rep. 1599
 In re APPLICATION TO QUASH SUBPOENA TO NATIONAL BROADCASTING
COMPANY, INC.
Steven KRASE and Jenny Krase, Plaintiffs,
v.
GRACO CHILDREN PRODUCTS, INC., Defendant-Appellee.
Ruth MARDEN, Plaintiff,
v.
GRACO CHILDREN PRODUCTS, INC., Defendant-Appellee.
Kerry Ann MURPHY, Plaintiff,
v.
GRACO CHILDREN PRODUCTS, INC., Defendant-Appellee.
NATIONAL BROADCASTING COMPANY, INC., Appellant.
 No. 1281, Docket 95-9118.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 12, 1996.
Decided April 4, 1996.
 
 Appeal from orders entered in the United States District Court for the Southern District of New York (Duffy, J.) denying a motion by appellant to quash a subpoena for the unbroadcasted portions of certain videotaped television interviews relating to an allegedly defective infant's cradle and holding appellant in contempt, the district court having rejected claims of privilege based on the New York Shield Law, the New York State Constitution and the United States Constitution.
 Susan E. Weiner, National Broadcasting Company, Inc., New York City (Floyd Abrams, Susan Buckley, Cahill Gordon & Reindel, New York City, of counsel), for Appellant.
 Richard W. Bethea, Jr., Stophel & Stophel, PC, Chattanooga, TN (Stephen S. Duggins, Stophel & Stophel, PC, James D. Silbert, Hinckley & Silbert, PC, New York City, Steven M. Lieberman, Rothwell, Figg, Ernst & Kurz, Washington, DC, of counsel), for Defendant-Appellee.
 (Robert P. LoBue, Patterson, Belknap, Webb & Tyler, LLP, New York City, of counsel), for American Broadcasting Companies, Inc., CBS Inc., Daily News, LP, Dow Jones & Company, Inc., and Fox News, Inc. as amici curiae.
 Before: VAN GRAAFEILAND, MINER and CABRANES, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Appellant National Broadcasting Company, Inc. ("NBC") appeals from orders entered in the United States District Court for the Southern District of New York (Duffy, J.) denying its motion to quash a subpoena for the unbroadcasted portions of certain videotaped television interviews and holding it in contempt. Such unbroadcasted portions are often referred to as "raw footage" or "out-takes." The subpoena giving rise to this appeal was issued out of the Southern District upon the request of appellee Graco Children's Products, Inc. ("Graco") in connection with its defense of a products liability action brought against Graco in the District of Massachusetts by Ruth Marden.
 
 
 2
 As appears from the caption, there originally were three products liability actions pending against Graco, two in the District of Massachusetts and one in the Southern District of Texas. These actions were based on similar claims that an infant's cradle manufactured by Graco was defective. In aid of its defense in each case, Graco served upon NBC subpoenas similar to the one at issue here. It withdrew the subpoena relating to the Murphy action prior to the district court decision reviewed on this appeal, and has since withdrawn the subpoena relating to the Krase action.
 
 
 3
 In denying the motion to quash, the district court rejected claims of privilege asserted by NBC under the New York Shield Law, the New York State Constitution, and the United States Constitution. Relying on the Shield Law, we reverse.
 
 BACKGROUND
 
 4
 "Dateline" is a prime-time news program produced by NBC at its national headquarters in New York City. On May 23, 1995, a Dateline report about infant deaths that occurred in Graco Converta-Cradles was aired. The Converta-Cradle was a swinging cradle for infants in which the infant was rocked from head-to-toe rather than from side-to-side as in traditional cradles. According to the Dateline report, nearly 190,000 Converta-Cradles were sold during the two years that Graco manufactured and distributed the product. Almost as soon as the product was placed on the market, the safety of the Converta-Cradle was seriously questioned. Fourteen infants were reported to have died in the cradle. After receiving notification from the Consumer Product Safety Commission in 1991, Graco stopped manufacturing the product. Sometime thereafter, Graco instituted a voluntary recall of the Converta-Cradles and notified its customers.
 
 
 5
 Dateline reported on various products liability lawsuits that had been commenced by parents whose infants had died in the Converta-Cradle, including the suit commenced by Ruth Marden for the wrongful death of her infant son, Alexander. Some of the parents and their lawyers were interviewed on videotape, and Dateline used portions of the interviews on the air. Among those interviewed were Ms. Marden and her lawyer, Daniel Leonard. A portion of Ms. Marden's interview, relating to the circumstances surrounding her son's death, was broadcast on the program, but no portion of Mr. Leonard's interview was used. Parts of other interviews also were used, including a portion of the interview of Richard Bethea, Graco's attorney. According to Mr. Bethea, Graco took the position that the infant deaths were caused by Sudden Infant Death Syndrome ("SIDS") and were in no way related to any defect in the Converta-Cradle. However, in the Dateline report, reference was made to Graco's records of internal meetings in which there were discussions of the risk of suffocation caused by the head-to-toe swinging motion of the Converta-Cradle. The Dateline report concluded with an admonition to "keep an eye out for cradles that may have slipped by the 1992 recall."
 
 
 6
 Approximately three months after the Dateline broadcast, Graco served a subpoena on NBC relating to the action brought in the District of Massachusetts by Marden against Graco. The subpoena required that NBC provide deposition testimony and produce the following items:
 
 
 7
 1. Any outtakes or raw footage (audio and/or video) of interviews with Andrew John Marden and/or Ruth Marden and/or their attorney, Daniel Patrick Leonard, concerning the following:
 
 
 8
 (a) The purpose, frequency and method of the Mardens' customary usage of the Graco Converta-Cradle which is the subject of this suit;
 
 
 9
 (b) Alexander Marden's physical condition, activities and usage of the Converta-Cradle on November 10, 1991;
 
 
 10
 (c) All of the facts, circumstances and events of November 10, 1991 involving Alexander Marden, the Marden children, Andrew John Marden and Ruth Marden; and
 
 
 11
 (d) The position in which Mrs. Marden found her child in Graco's Converta-Cradle product on the evening of November 10, 1991, or her recollections thereof.
 
 
 12
 2. Any notes of interviews with the Mardens or their attorney, Daniel Patrick Leonard, concerning the areas of inquiry set forth in Paragraph 1 above.
 
 
 13
 3. Any outtakes or raw footage (audio and/or video) containing any and all information concerning the areas of inquiry set forth in Paragraph 1 above.
 
 
 14
 4. Any notes containing any and all information concerning the areas of inquiry set forth in Paragraph 1 above.
 
 
 15
 Shortly after the subpoena was served, NBC filed its motion to quash, contending that the material sought was protected by the qualified journalist's privilege for non-confidential newsgathering material established by the New York Shield Law, the New York State Constitution and the First Amendment to the United States Constitution. NBC argued, inter alia, that Graco had not shown that the material was critical or necessary to Graco's defense of the underlying lawsuit, as required by the Shield Law. It also contended that there was no basis whatsoever for obtaining the out-takes of the interview with Marden's attorney, because the attorney was not a party, his statements were not evidence of the facts in dispute, and he had not been deposed. NBC noted that Marden herself was a source of information about her child's physical condition, his position in the Converta-Cradle and her use of the product. Indeed, Graco had deposed Ms. Marden in regard to these matters after the Dateline broadcast.
 
 
 16
 In opposition to the motion to quash, Graco argued that the out-takes were necessary to its defense because they might reveal statements that could be used to impeach trial testimony on such matters as the infant's position in the cradle, its physical condition prior to death and the use of the cradle. According to Graco, the out-take material was essential to its SIDS defense. Graco also advanced the argument that the out-takes were necessary because the interview portions broadcast were themselves inconsistent with the deposition testimony, apparently contending that the out-takes would demonstrate further inconsistencies. Also, Graco claimed that Ms. Marden admitted at her deposition, given two months after the broadcast of her Dateline interview, that she was unable to reconstruct the interview. In sum, Graco asserted that the out-takes were necessary to its defense because there were inconsistencies between the broadcast statements and the later deposition testimony of Ms. Marden, because she revealed previously undisclosed information to NBC, because inconsistencies in the out-takes could be critical to the defense, and because alternative sources of information were not available.
 
 
 17
 On October 5, 1995, the district court issued its Memorandum & Order denying the motion to quash and directing compliance with the subpoena. In the opinion, the court first noted that, on oral argument of the motion, Graco had agreed to limit the subpoena's scope to the out-takes only. The court found that certain statements made during the aired interview were inconsistent with the deposition testimony "and previous reports" and therefore that "[t]he statements made on the video out-takes might contain other inconsistent statements, which can be used either as admissions or for impeachment purposes by Graco in [the underlying] litigation." The district court stated:
 
 
 18
 The material contained in the video out-takes, therefore, (1) is highly material and relevant to the litigation since it relates directly to testimony given by the parties to the litigation; (2) is critical and necessary to Graco's defense since Graco will be able to use these statements in its defense; and (3) is, as movant admits, solely in the hands of NBC and, therefore, unavailable from any other source. Since the statements on the out-takes are not cumulative of other sources of impeachment, Graco should be allowed access to the out-takes.
 
 
 19
 The district court responded as follows to NBC's argument that Graco failed to show that the out-takes actually included inconsistent statements:
 
 
 20
 This argument would create an absolute privilege where only a qualified privilege exists. As a practical matter, there would be no way to know whether the plaintiffs have made any admissions or inconsistent statements unless the out-takes were viewed by Graco. Any argument by NBC to the contrary is absurd.
 
 
 21
 Following issuance of the Memorandum & Order, NBC filed a motion for stay pending appeal, and Graco cross-moved to hold NBC in contempt and to clarify the October 5 decision to indicate that the out-takes of the interviews with counsel were to be produced. Responding to the motion for clarification, the court wrote, in an order dated November 9, 1995:
 
 
 22
 As clearly stated in the opinion, I limited the scope of the subpoenas to the video out-takes, not to specific video out-takes. As counsel for NBC is aware, the original subpoenas called for the production of much more material, including the interviewing reporter's notes. Counsel for Graco agreed to limit the scope of the subpoenas to the [video out-takes] only. NBC's attempt to cloak their refusal to produce the out-takes of the plaintiffs' attorneys as simply a matter of strict compliance with my order is nonsense.
 
 
 23
 (Citation omitted). The district court responded to the contempt motion by directing in the same order the payment of sanctions of $5,000 per day "until NBC produces all the video out-takes." The motion for a stay of the sanctions pending appeal was denied in the same order. Thereafter, we granted a stay motion and directed that the appeal be heard on an expedited basis.DISCUSSION
 
 
 24
 The subpoena served by Graco in connection with its defense of the wrongful death action brought by Ruth Marden in the District of Massachusetts was issued out of the Southern District of New York. It required the production in New York of the out-takes from a Dateline program produced in New York City by NBC, a New York-based broadcaster. It is clear that any privileges relating to the information sought are governed by New York law under these circumstances. See Fed.R.Evid. 501; In re American Tobacco Co., 880 F.2d 1520, 1527 (2d Cir.1989) (applying New York law on expert's privilege to subpoena issued out of the Southern District of New York in connection with products liability actions pending in various other jurisdictions).
 
 
 25
 Section 79-h of the New York Civil Rights Law (New York Shield Law) provides a qualified privilege for professional journalists or newscasters as to unpublished news secured in the course of newsgathering activities:
 
 
 26
 Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist or newscaster ... shall be adjudged in contempt by any court ... for refusing or failing to disclose any unpublished news obtained ... in the course of gathering or obtaining news ... unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source.
 
 
 27
 N.Y. Civ. Rights Law § 79-h(c) (McKinney 1992).
 
 
 28
 NBC concedes that Graco has satisfied the first of the enumerated factors--that the out-takes are highly material and relevant. It contends, however, that Graco failed to carry its burden of making a clear and specific showing that the out-takes are critical and necessary to Graco's defense of the action brought by Ruth Marden (the second factor), and that the information sought is unavailable elsewhere (the third factor). We agree.
 
 
 29
 Graco contends that the out-takes it seeks are critical and necessary to its defense in the Marden litigation because they are likely to provide statements or admissions by Ms. Marden concerning pivotal elements of her case. These elements are said to include "the position of the deceased infant and environmental factors surrounding the death of the infant." According to Graco, evidence in regard to these matters would greatly assist it in establishing that Alexander Marden's death was caused by SIDS or positional asphyxia and not as a result of a design defect in the Converta-Cradle. Graco also argues that the out-takes are likely to include statements by Ms. Marden that contradict her deposition testimony and therefore would be valuable for impeachment purposes.
 
 
 30
 The district court found that the material contained in the out-takes "is critical and necessary to Graco's defense since Graco will be able to use these statements in its defense." We think that "critical or necessary" as used in the statute must mean something more than "useful," particularly since the first statutory factor requires that the material sought must be shown to be "highly material and relevant" in any event. Several courts have held that in order to find unpublished news to be critical or necessary within the meaning of § 79-h, there must be a finding that the claim for which the information is to be used "virtually rises or falls with the admission or exclusion of the proffered evidence." United States v. Marcos, No. 87 CR 598, 1990 WL 74521, at * 3 (S.D.N.Y. June 1, 1990); Sommer v. PMEC Assocs. and Co., No. 88 CIV. 2537, 1991 WL 73858, at * 3 (S.D.N.Y. May 1, 1991); see also Doe v. Cummings, No. 91-346, 1994 WL 315640, at * 1 (N.Y.Sup.Ct. Jan. 18, 1994) ("The test is not merely that the material be helpful or probative, but whether or not the defense of the action may be presented without it."). It seems to us that the "virtually rises or falls" formulation should be applied to determine whether the critical or necessary test has been met. Applying that formulation, it simply cannot be said that Graco has made the required clear and specific showing that the statute requires.
 
 
 31
 The entire portion of the Dateline broadcast involving Ms. Marden, including her answers to the questions put to her by the interviewer, was as follows:
 
 
 32
 Ms. RUTH MARDEN: I was very angry. There was no need for Alec to die, none at all.
 
 
 33
 HANSEN: (Voiceover) Ruth Marden, like Jenny Krase, discovered her infant son lifeless in his cradle swing. She also was told her son was a victim of SIDS. But because she had her suspicions, Marden, an emergency room nurse, says she insisted the medical examiner investigate further. He didn't.
 
 
 34
 (Photo of Alec Marden; Ms. Marden walking in the woods)
 
 
 35
 HANSEN: Did the medical examiner or anybody from his office examine the death scene?
 
 
 36
 Ms. MARDEN: No.
 
 
 37
 HANSEN: Did the police examine the death scene?
 
 
 38
 Ms. MARDEN: No.
 
 
 39
 HANSEN: Were photographs taken of the death scene?
 
 
 40
 Ms. MARDEN: No.
 
 
 41
 HANSEN: Did the medical examiner in any way look at or investigate the circumstances, physically, surrounding Alec's death?
 
 
 42
 Ms. MARDEN: No.
 
 
 43
 HANSEN: What does that say to you?
 
 
 44
 Ms. MARDEN: That there was no foundation for a diagnosis of SIDS. They have not met the criteria for SIDS.
 
 
 45
 Graco asked us to infer that the out-takes contain information regarding the positioning of the Marden infant in the cradle, although there is no basis for us to do so. In any event, Graco had the opportunity to elicit this information at Ms. Marden's deposition and the out-takes, if any there were in this regard, were therefore not critical or necessary to the defense. Graco also claims that there were inconsistencies between Ms. Marden's aired interviews and her deposition testimony and that the out-takes probably would show additional inconsistences. Graco argues that such inconsistencies could be critical to its impeachment of Marden and therefore necessary for its defense case. As an example of inconsistency, Graco refers to a statement made by the Dateline interviewer and supposedly conflicting deposition testimony. The interviewer stated: "Marden, an emergency room nurse, says she insisted the medical examiner investigate further. He didn't." This statement was said to conflict with Marden's deposition testimony that the medical examiner did engage in further investigation.
 
 
 46
 There is a serious question whether the interview broadcast was inconsistent with Ms. Marden's testimony in any respect. Ms. Marden testified that she felt that the "whole situation wasn't dealt with as thoroughly as it should have been." Although Ms. Marden did testify that the medical examiner conducted a further investigation after she informed him about the cradle, she indicated in her testimony that she wanted him to investigate further. She said: "I urged him to investigate the subject matter that caused my son's death and that would have included investigating the scene." It is difficult to identify any inconsistency between Ms. Marden's deposition testimony and her on-the-air interview.
 
 
 47
 Even if there were any inconsistencies of this nature, there is no basis for concluding that the out-takes would establish any further inconsistencies, and Graco has made no showing in that regard. Moreover, while it is clear that any inconsistent statements by Marden would be relevant to Graco's defense for impeachment purposes, it is far from clear that they would be necessary within the meaning of the Shield Law. Ordinarily, impeachment material is not critical or necessary to the maintenance or defense of a claim, and there is no clear and specific showing that it would be so here. Certainly, there is no showing that Graco's defense to Ms. Marden's wrongful death action rises or falls on impeachment evidence of the type sought here.
 
 
 48
 Graco argues that our decision in United States v. Cutler, 6 F.3d 67 (2d Cir.1993), supports its claim of entitlement to the out-takes. Cutler arose from a federal criminal contempt proceeding against attorney Bruce Cutler for violating a court order directing him to comply with a local rule prohibiting the release of information in a pending criminal case. The proceeding was based on Cutler's statements to the media regarding the criminal prosecution of his client, John Gotti. We affirmed the order compelling the disclosure of out-takes of Cutler's own statements, applying a standard identical to that embodied in the New York Shield Law:
 
 
 49
 The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.
 
 
 50
 Id. at 71 (quotation omitted).
 
 
 51
 In allowing the production of the out-takes, we noted that the prosecution intended to introduce statements made by Cutler over an extended period of time to establish a pattern of conduct. The statements allegedly were designed to influence potential jurors as well as to establish Cutler's intent to disobey whatever orders ultimately were determined to give rise to contempt sanctions. We thought that Cutler should be entitled to have the out-takes as necessary information to enable him to respond to the prosecution on these issues. Moreover, since a major line of defense put forward by Cutler was that his statements were made in reply to charges of misconduct and therefore were not contemptuous under the local rule, we opined that such "defense would be undercut if Cutler could not obtain relevant evidence regarding the context of his statements that is available only from the ... TV Stations." Id. at 73-74.
 
 
 52
 The unbroadcasted tapes sought by Graco contain information, according to its own allegations, that clearly is obtainable from other sources, while the out-takes in Cutler included information not available elsewhere: "Other than Cutler's own testimony, which of course cannot be compelled, the evidence that Cutler seeks from ... the TV Stations is probably the only significant proof regarding his assertedly criminal behavior." Id. at 73. The district court concluded that, because the material contained in the out-takes sought by Graco is solely in the hands of NBC, it is "therefore, unavailable from any other source." However, it cannot be said that pertinent material is not obtainable elsewhere just because it is included in some out-takes.
 
 
 53
 In any event, Graco failed to make the requisite clear and specific showing of unavailability. See In re CBS, 23 Media L. Rep. (BNA) 2311, 2312 (N.Y.Sup.Ct.1995). Ms. Marden clearly was available to answer questions about the circumstances surrounding her son's death, his position in the Converta-Cradle, and his physical condition before he died. Graco has made no showing that it attempted to obtain the information from other sources, such as the medical examiner. Graco simply failed to exhaust all other available sources of information. See In re Pan Am Corp., 161 B.R. 577, 585 (S.D.N.Y.1993). The fact that Ms. Marden testified in her deposition that she was unable to "reconstruct" everything that she said during her Dateline interview does not seem pertinent to this inquiry.
 
 
 54
 Finally, Graco has advanced no argument of any kind that would justify a direction that NBC produce the out-takes of the interview of Ms. Marden's attorney. The entire interview of the attorney, Daniel Leonard, was an out-take, because no part of that interview was broadcast and Graco has absolutely no idea of what Mr. Leonard did or did not tell the interviewer.
 
 CONCLUSION
 
 55
 For the foregoing reasons, we reverse the orders of the district court, and we remand with directions to grant the motion to quash the subpoena for the out-takes of the interviews of Ruth Marden and Daniel Leonard.