Albert GONZALES and Mary Gonzales, Plaintiffs–appellees, Deputy Darrell Pierce, Defendant–Appellee

v.

NATIONAL BROADCASTING COMPANY, INC., Respondent–Appellant.

No. 97–9454.

United States Court of Appeals, Second Circuit.

Argued May 7, 1998.

Decided Sept. 22, 1998.

Susan E. Weiner, New York City (Daniel M. Kummer, National Broadcasting Company, Inc. Law Department, New York City, of counsel), for Respondent–Appellant.

Perry R. Sanders, Jr., Lake Charles, LA (Sanders, Crochet & Chism, LLP, Lake Charles, LA, Brian D. Caplan, Goodkind, Labaton, Rudoff & Scharow, New York City, of counsel), for Plaintiffs–Appellees.

Michael O. Hardison, Snow, Becker & Krause, New York City, Andre J. Buisson, Jennings, LA, of counsel, for Defendant–Appellee.

BEFORE: McLAUGHLIN and PARKER, Circuit Judges, and SPATT *, District Judge.

PARKER, Circuit Judge:

Respondent–Appellant National Broadcasting Company, Inc. ("NBC") appeals from an Opinion and Order of the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge*), entered September 26, 1997, granting in part and denying in part motions to compel compliance with non-party subpoenas issued to NBC, as well as from an Order of Contempt, entered October 29, 1997, holding NBC in contempt for non-compliance with the previous order. The subpoenas sought production of unedited, unbroadcast videotapes, known as "outtakes," and deposition testimony from NBC representatives concerning the events recorded on the videotapes. The subpoenas, issued out of the Southern District of New York, were served on NBC by the parties to a civil rights action commenced in the Western District of Louisiana.

The district court found that this Circuit has recognized a qualified journalists' privilege under federal law to protect nonconfidential information, but nevertheless held that the test for overcoming that privilege had been satisfied, and accordingly directed NBC to produce the outtakes and an affidavit authenticating them. We disagree with the district court's holding that there exists a qualified journalists' privilege for nonconfidential information under federal law, and for the reasons that follow, decline to recognize such a privilege today. Because the materials sought by the subpoenas contain no confidential information or sources, are relevant to plaintiffs' case and properly discoverable under Fed.R.Civ.P. 26, we affirm the orders of the district court granting in part the motions to compel and holding NBC in contempt.

## I. BACKGROUND

Albert Gonzales and Mary Gonzales (the "Gonzaleses") are plaintiffs in a civil rights action under 42 U.S.C. §§ 1983 and 1988 brought in the United States District Court for the Western District of Louisiana (the "Louisiana Action"). In the Louisiana Action, the Gonzaleses claim that defendant Darrell Pierce, a Louisiana Deputy Sheriff ("Deputy Pierce"), pulled them over on Interstate 10 on November 28, 1995 without any probable cause or reasonable suspicion, and detained them longer than other, similarly situated Caucasians, due to their Hispanic origin. The Gonzaleses also claim that it was

* The Honorable Arthur D. Spatt, of the United States District Court for the Eastern District of New York, sitting by designation.

the custom, habit and practice of Deputy Pierce to pull out-of-state travelers over without probable cause or reasonable suspicion, and that it was his custom, habit and practice to detain and question minority citizens, including Hispanics, longer than similarly situated Caucasians. The Gonzaleses seek compensatory and punitive damages, as well as an injunction prohibiting Deputy Pierce from stopping travelers without probable cause or reasonable suspicion and from detaining minority travelers longer than similarly situated Caucasians.

The Gonzaleses assert that they intend to call as witnesses at trial in the Louisiana Action other motorists who were stopped at or about the same place and time by Deputy Pierce and who claim that they were not engaged in the activity cited by Deputy Pierce as the reason for pulling them over. Plaintiffs also plan to introduce videotapes of highway stops performed by Deputy Pierce and recorded by a camera placed on the top of Deputy Pierce's patrol car. Because the camera was only activated after the vehicle came to a stop, however, these videotapes only show Deputy Pierce's actions after a stop was made, and do not capture the allegedly illegal conduct that caused Deputy Pierce to stop the subject car.

On January 3, 1997, NBC aired a segment on its "Dateline" television program reporting on what it described as pervasive abuses by law enforcement officers in Louisiana who conduct unwarranted stops of motorists, particularly of out-of-state travelers. As laid out in the report, these stops sometimes led to seizure of vehicles and property. The Dateline report included a videotape stop of one of its employees, Pat Weiland, by Deputy Pierce. While investigating these unwarranted highway stops, Weiland, a Dateline producer and a cameraman, rented a car, equipped it with hidden cameras and traveled on Louisiana roadways. In May 1996, six months after the Gonzaleses' car was pulled over, Deputy Pierce stopped the car driven by Weiland, claiming that it had been slowing down and speeding up. The Dateline program claimed that the car had in fact been on cruise control at 64 miles per hour, below the

posted speed limit. The broadcast briefly showed five video images of the car as it was in motion, but it did not show all of the car's movements prior to the stop. Dateline claimed that the hidden camera footage showed that no traffic laws had been violated and that the car was stopped without probable cause. The report also included the hidden camera footage showing the car being pulled over and Deputy Pierce examining the currency compartment of Weiland's wallet.

On August 11, 1997, the Gonzaleses served NBC with a subpoena seeking the original, unedited camera footage of Deputy Pierce's stop of Weiland, and deposition testimony from NBC representatives about the events recorded on the videotape. Specifically, the subpoena sought the footage of the car as it was moving prior to the traffic stop, through the traffic stop and subsequent roadside encounter. On September 10, 1997, Deputy Pierce served a subpoena on NBC in virtually identical terms to the Gonzaleses' subpoena. NBC objected to both subpoenas on the grounds that they were unduly burdensome, and that they sought documents and testimony protected from disclosure by the privilege afforded journalists under the First Amendment to the United States Constitution. Both the Gonzaleses and Deputy Pierce filed motions to compel NBC's compliance with their respective subpoenas in the Southern District of New York in September 1997.[1]

On September 26, 1997, the district court issued an Opinion and Order granting in part and denying in part the motions to compel NBC's compliance with the subpoenas. *Gonzales v. Pierce*, 175 F.R.D. 57 (S.D.N.Y.1997). The parties agreed below, as they do on appeal, that the scope of the privilege is governed by federal law because the underlying case asserted a federal cause of action. The district court held that there was a qualified journalists' privilege, which was applicable to nonconfidential information, quoting the following statement:

> The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and

---

**1.** Although the district court's decision covers both subpoenas, Deputy Pierce declined to file an appellate brief in this matter. Accordingly, we

address only those arguments raised by the Gonzaleses in this opinion.

specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources.

*McGraw-Hill, Inc. v. Arizona (In re Petroleum Products Antitrust Litigation)*, 680 F.2d 5, 7 (1982) (per curiam) (*"Petroleum Products "*). However, the district court held that the three part test was met in this case. Specifically, the court held that the Gonzaleses had made a showing that the tapes were "highly material and relevant" because some of their claims alleged a pattern and practice of illegal stops by Deputy Pierce, and each additional instance of an illegal stop was relevant to that claim. Further, the district court found that the Gonzaleses had established that the tapes were "necessary or critical" to their claim because they were seeking punitive damages and injunctive relief, and such relief can only be attained upon a showing of a pattern or practice of conduct. The court also found that the evidence the Gonzaleses sought would not be obtainable from other available sources.

The district court held that Deputy Pierce's need for the tapes was equally compelling. If the tapes demonstrated that Deputy Pierce had probable cause to stop the Dateline car, "they would provide unique evidence of both his proper behavior and his veracity." 175 F.R.D. at 60. Finally, the court held that "[c]ompelling production of the tapes [was] further supported by the fact that no confidential information [was] at issue here." *Id.*

Accordingly, the court below ordered NBC to produce the outtakes and an affidavit authenticating them. However, the court denied the motion to compel with respect to the deposition testimony from NBC representatives, with leave to renew should the Louisiana court require further authentication of the tapes. On October 29, 1997, the district court entered an Order of Contempt against NBC for its failure to comply with the court's previous order directing NBC to produce the unbroadcast videotapes to the Gonzaleses and Deputy Pierce. NBC timely appealed.

## II. DISCUSSION

■ NBC argues that the three part test set forth in *Petroleum Products* "indisput-ably" applies to information prepared or obtained by journalists gathering news, regardless of whether such information is confidential. We disagree. In our view, the case law in this Circuit firmly grounds the journalists' privilege on the confidential nature of the information. Although there is limited dicta to support NBC's position, we do not believe that this Circuit has recognized a journalists' privilege for nonconfidential information under federal law, or that the First Amendment requires us to do so. Given this holding, we need not consider NBC's argument that the district court erred in finding that the three part test of *Petroleum Products* was met in this case. For the reasons that follow, we affirm the district court's order compelling the production of the information and the order holding NBC in contempt.

### A. Whether the Second Circuit has Already Created a Journalist's Privilege for Nonconfidential Information

The leading Supreme Court decision on the journalists privilege is *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). *Branzburg* involved three consolidated appeals in which reporters had cited the First Amendment in refusing to respond to grand jury subpoenas and to disclose information received by them in confidence. As stated by the Court, "[t]he heart of [their] claim [was] that the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information." *Id.* at 681, 92 S.Ct. 2646. Although the Court recognized that "news gathering is not without its First Amendment protections," *id.* at 707, 92 S.Ct. 2646, the Court declined to recognize a privilege in these circumstances, holding, by a five-judge majority, that reporters were not exempt from the obligation imposed on other citizens to "respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690–91, 92 S.Ct. 2646. In the Court's view, "the public interest in law enforcement and in ensuring effective grand jury proceedings" was sufficient to override the "uncertain" burden on news gathering. *Id.* at 690, 92 S.Ct. 2646.

In a separate concurrence, Justice Powell wrote that he did not regard the majority as having held that "harassment of newsmen will be tolerated," or that reporters would be compelled "to give information bearing only a remote and tenuous relationship to the subject of the investigation." *Id.* at 709–10, 92 S.Ct. 2646. According to Justice Powell, "[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710, 92 S.Ct. 2646.

We first considered the journalists' privilege in light of *Branzburg* in *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir.1972). *Baker* was a civil rights action alleging racially discriminatory practices in the sale of housing in Chicago, in which the plaintiff sought to compel the author of an article on certain discriminatory practices to reveal the identity of his confidential source. The district court declined to compel the author to reveal his source. We affirmed, distinguishing *Branzburg* as having only "tangential relevance" to the case because *Branzburg* involved the right of a journalist to withhold disclosure of confidential sources from a grand jury investigating criminal activities. *Id.* at 784. As the court in *Baker* explained, there are circumstances, at least in civil cases, where the "public interest in non-disclosure of a journalist's confidential sources outweighs the public and private interest in compelled testimony," *id.* at 783, and *Baker* was such a case. As we have subsequently acknowledged, however, "[c]entral to our analysis in *Baker* was our concern" about the deterrent effect on future confidential information resulting from a rule of compelled disclosure at least in every claim arising under the civil rights acts. *See von Bulow v. von Bulow,* 811 F.2d 136, 142 (2d Cir.1987). We stated in *Baker:*

> Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis—and the district court so found. The deterrent effect such disclosure is likely to have upon future "undercover" investigative reporting ... threatens freedom of the press and the public's need to be informed.

470 F.2d at 782.

In *Petroleum Products,* the next case to consider the journalists' privilege, we adopted a three part test, citing *Baker.* The test was expressly based on the interest in "preserving the confidentiality of journalists' sources," and we did not address the question whether the privilege extends to nonconfidential information. *Petroleum Products,* 680 F.2d at 7. Subsequently, in *United States v. Burke,* 700 F.2d 70 (2d Cir.1983), we held that the *Petroleum Products* test should be applied in criminal cases as well. In *Burke,* the defendant sought the production of documents and tapes relating to a magazine article co-authored by a principal prosecution witness and a reporter for the magazine. The magazine successfully moved to quash the subpoena in the district court, invoking the journalist's privilege. We affirmed. Applying the *Petroleum Products* test, we held that because the materials were sought for impeachment purposes only, and were cumulative of the other "extensive impeachment evidence" in the case, the First Amendment privilege was not defeated. *Id.* at 78.

It is not clear whether the subpoena in *Burke* called for the production of nonconfidential as well as confidential information. The court did not address the question of whether there was a distinction between confidential and nonconfidential information for purposes of applying the privilege. Certain of the court's statements, as well as the fact that review was in camera, suggest that the information sought by the subpoena was confidential. *See id.* at 77 (finding no reason to draw "a distinction between civil and criminal cases when considering whether the reporter's interest in *confidentiality* should yield to the moving party's need for probative evidence") (emphasis added). Accordingly, we do not read *Burke* as standing for the proposition that the *Petroleum Products* test should be applied regardless of whether the material is confidential.[2]

NBC relies heavily on *von Bulow* and *Krase v. Graco Children Prods., Inc. (In re*

---

2. We also note that we have subsequently limited the holding in *Burke.* In *United States v. Cutler,*

6 F.3d 67 (2d Cir.1993), in response to an argu-

*Nat'l Broadcasting Co., Inc.)*, 79 F.3d 346 (2d Cir.1996) ("*Graco*") in support of its position that this Circuit has previously recognized a journalist's privilege for nonconfidential information. In *von Bulow*, where the underlying action was civil litigation commenced by the von Bulow children, the district court ordered the author of an unpublished book about the events surrounding the von Bulow prosecution to produce investigative reports commissioned by the author, notes taken while observing the criminal trial, and the manuscript of the book. The author claimed that the documents were protected from disclosure by the journalists' privilege. We agreed with the district court that the author was not a "journalist" for the purpose of resisting compelled production of the information, and therefore held that the information was not protected by the journalists' privilege. *von Bulow*, 811 F.2d at 145. Although it was not necessary to the decision, we noted in passing that "[o]ther federal courts have held that the privilege can be invoked to shield disclosure of nonconfidential sources and nonconfidential information," *id.* at 143 (citing *United States v. Blanton*, 534 F.Supp. 295 (S.D.Fla.1982), *aff'd*, 730 F.2d 1425 (11th Cir.1984), and *Loadholtz v. Fields*, 389 F.Supp. 1299 (M.D.Fla.1975)).[3] Since these statements are dicta, and the opinion contains no further analysis as to whether the journalist's privilege should extend to nonconfidential information, we do not regard these statements as binding.

Nor do we regard *Graco* as controlling on this appeal, because it was decided under New York law rather than federal law. In *Graco*, the defendant in a products liability action subpoenaed NBC seeking outtakes of a Dateline program which included an interview of the plaintiff in that action. The district court denied NBC's motion to quash, rejecting its claims of privilege asserted under the New York Shield Law, New York State Constitution and the United States Constitution. In reversing the district court, we specifically stated that we were only "[r]elying on the [New York] Shield Law." *Graco*, 79 F.3d at 348.

NBC claims that we are bound by *Graco* because the journalists' privilege under federal law is identical to that embodied in the New York Shield law. We disagree. New York law provides for an absolute privilege for confidential information, *see* N.Y. Civ. Rights Law § 79–h(b), and a qualified privilege for nonconfidential information similar to the three part test set forth in *Petroleum Products. See* N.Y. Civ. Rights Law § 79–h(c). However, we have never recognized an absolute privilege for confidential information in this Circuit, *see, e.g., Baker*, 470 F.2d at 783 ("while we recognize that there are cases ... where First Amendment rights must yield ..."), and we can find no binding precedent for the proposition that the qualified journalists' privilege for confidential information under federal law, which we recognized in *Baker*, extends to nonconfidential information. Accordingly, NBC's assertion that we are bound by precedent to apply the three-part test of *Petroleum Products* to the nonconfidential information sought in this case is incorrect.

B. *Whether We Should Create a Journalist's Privilege for Nonconfidential Information*

█ Having determined that this Court has not yet recognized a journalist's privilege for nonconfidential information, we turn to the question of whether the First Amendment requires us to do so.[4] At the outset,

---

ment that *Burke* was at odds with *Branzburg*, we stated that "*Burke*'s articulation of a general test applicable to all phases of a criminal trial was not necessary to the resolution of that case," and accordingly *Burke* should "be considered as limited to its facts." *Id.* at 73. We declined to resolve the "claimed conflict" between *Branzburg* and *Burke*, finding the facts in *Cutler* sufficiently analogous to *Branzburg* as to determine the result, affirming the order of the district court in so far as it required production of reporters' testimony, unpublished notes and outtakes of statements made by Cutler himself to the media. *Id.* at 75.

3. The Court also stated, without citing any authority, that "the relationship between the journalist and his source may be confidential or nonconfidential for purposes of the privilege." *Id.* at 142.

4. There are three potential sources for the privilege NBC asserts: this Court's case law, common law, and the U.S. Constitution. NBC properly makes no claim in this appeal that there is or should be a qualified privilege at common law to protect the nonconfidential information in this case.

we note that evidentiary privileges, "[w]hatever their origins ... are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). "[E]ven those rooted in the Constitution must give way in proper circumstances." *Herbert v. Lando,* 441 U.S. 153, 175, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). On the other hand, as we have previously stated, "we are still mindful of the preferred position which the First Amendment occupies in the pantheon of freedoms." *Baker,* 470 F.2d at 783. We also recognize the important role of the press, acting as an agent for the public, in ensuring "the free flow of information and ideas essential to intelligent self-government." *Saxbe v. Washington Post Co.,* 417 U.S. 843, 863, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting); *see First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 781, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (noting the "special and constitutionally recognized role of [the press] in informing and educating the public, offering criticism, and providing a forum for discussion and debate"). Accordingly, we do not take any alleged threat to the freedom of the press lightly.

NBC claims that subpoenas that seek newsgathering material substantially intrude on the process of gathering, editing and presenting the news to the public, regardless of whether the information sought is confidential. NBC makes two arguments in support of its claim that producing nonconfidential information will interfere with its First Amendment rights. First, NBC argues that having to disclose nonconfidential, unbroadcast information will interfere with the editorial process. Second, NBC contends that without a privilege for nonconfidential information, news organizations will be flooded with non-party subpoenas, responding to which will hamper newsgathering activities. We consider these arguments in turn.

NBC's first argument is based on a journalists' editorial freedom to select what information will be published. NBC does not claim that journalists will in fact make poor editorial decisions if there is no privilege, rather NBC argues, somewhat unclearly, that journalists' editorial decisions "should not bear the constant risk that disclosure of newsgathering material will be sought and compelled in litigation."

NBC presents no persuasive argument, much less any empirical evidence, as to how disclosure of nonconfidential material after a news story has been published will interfere with journalists' editorial decisions. Presumably, the argument is that the possibility of subsequent compelled disclosure that will subject editorial decisions to hindsight analysis will influence the editorial decisions that are made. This assertion, even if accepted as true, is too remote a burden on the First Amendment to justify the creation of a privilege in this case. *See University of Pennsylvania v. EEOC,* 493 U.S. 182, 200–01, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (rejecting University's claim for First Amendment protection of academic peer review materials on the ground that the alleged burden on the First Amendment was too "remote and attenuated"); *Branzburg,* 408 U.S. at 695, 92 S.Ct. 2646 ("Accepting the fact ... that an undetermined number of informants ... [will] refuse to talk to newsmen if they fear identification by a reporter in an official investigation, we cannot accept the argument that the public interest in possible future news about crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants....").

Further, we seriously doubt that, in today's competitive news reporting environment, journalists' decisions on what to publish will in fact be adversely affected by the possibility of having their nonpublished, nonconfidential material subpoenaed in future litigation. Additionally, to the extent that the lack of a privilege may affect editorial decisions, it seems that this effect may well accrue to the public's benefit. Specifically, to the extent that the threat of subsequent analysis of editorial decisions increases the accountability of editors for their presentation of the news, such scrutiny is likely to make the final news product more complete, accurate and reliable.

Moreover, the Supreme Court has already rejected a claim of privilege, based on the First Amendment, protecting materials relat-

ing to the editorial process largely on this basis. In *Herbert*, the plaintiff in a defamation suit sought to compel the author of the article that defamed him to answer certain questions pertaining to the author's state of mind, in order to establish malice, a critical element of the defamation cause of action since *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The author refused to answer these questions on the ground that the First Amendment protected against inquiry into the state of mind of those who edit, and into the editorial process. The Court rejected this argument, reasoning that, to the extent that inquiry into the editorial process created a "fear of damages liability for publishing knowing or reckless falsehoods," those effects were consistent with the First Amendment. *Herbert*, 441 U.S. at 171, 99 S.Ct. 1635. The Court expressed doubts that inquiry into falsehoods would stifle publication of truthful information. *Id.* at 172–73, 99 S.Ct. 1635. As to the argument that "frank discussion among reporters and editors will be dampened and sound editorial judgement endangered if such exchanges, oral or written, are subject to inquiry," the Court stated:

> We do not doubt the direct relationship between consultation and discussion on the one hand and sound decisions on the other; but whether or not there is liability for the injury, the press has an obvious interest in avoiding the infliction of harm by the publication of false information, and it is not unreasonable to expect the media to invoke whatever procedures may be practicable and useful to that end.

*Id.* at 173–74, 99 S.Ct. 1635.

In other words, the Court rejected the claim that there would be a negative impact on the press, or on the gathering, editing and dissemination of news, if the editorial process is subjected to scrutiny. As noted above, if anything, such scrutiny is likely to enhance the reliability and truthfulness of news reporting. These principles apply equally to the request for the unbroadcast, nonconfidential information in this case. For example, if the tapes of the Dateline car demonstrated, contrary to NBC's assertion in its program, that the car was in fact driving illegally and consequently Deputy Pierce was justified in pulling the car over, such expo-

sure of a falsehood would do no injury to the First Amendment.

NBC's second argument is that without a journalist's privilege for nonconfidential information, the press will be subjected to a flood of subpoenas that will force journalists to be "participants in litigation." However, NBC's argument that the press needs constitutional protection from the burden of answering discovery requests is unpersuasive. As the Supreme Court has made clear:

> the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. Under [Supreme Court] cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed.

*Branzburg*, 408 U.S. at 682–83, 92 S.Ct. 2646; *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (recognizing the "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."). Further, we agree with the observation made by the Fifth Circuit in rejecting a First Amendment claim made by a television station for a privilege for nonconfidential information in a criminal case:

> Responding to discovery may well take valuable time, decreasing to that extent resources available for news reporting. Yet in the immediate sense, the press here is not differently situated from any other business that may find itself possessing evidence relevant to a criminal trial. It has a relevant and protectible interest in not being unduly burdened, as, for example, by overly broad subpoenas for large amounts of data of dubious relevance. But this burden is case specific.

*United States v. Smith*, 135 F.3d 963, 970 (5th Cir.1998).

Additionally, the argument advanced by NBC regarding burdensome discovery was also made and rejected by the Supreme Court in *Herbert*. There, respondents urged

the Court to recognize a First Amendment privilege for the editorial process because "the press needs constitutional protection from these burdens if it is to perform its task, which is indispensable in a system such as ours." 441 U.S. at 176, 99 S.Ct. 1635. The Court acknowledged that the costs and burdens of discovery in defamation litigation may well have escalated due to relatively recent changes in defamation law. Nevertheless, despite "repeated expressions of concern about undue and uncontrolled discovery," *id.* at 176, 99 S.Ct. 1635, the Court declined to "creat[e] a constitutional privilege foreclosing direct inquiry into the editorial process," *id.*, stating that "until and unless there are major changes in the present Rules of Civil Procedure, reliance must be had on what in fact and in law are ample powers of the district judge to prevent abuse." *Id.* at 177, 99 S.Ct. 1635.

NBC asserts in its brief, without further elaboration, that news organizations frequently investigate and report on "misconduct or misfeasance that litigants claim were visited upon them," presumably in an effort to persuade us that news organizations are differently situated in terms of the amount of discovery requests they will receive. Again, however, NBC presents no evidence to suggest that the frequency with which litigants will request relevant evidence from news organizations will impede newsgathering or even deplete the amount of time spent thereon. Accordingly, we find NBC's claims speculative at best. In view of this "uncertain" burden on newsgathering, we decline to recognize a First Amendment privilege for non-confidential information. *See University of Pennsylvania,* 493 U.S. at 201, 110 S.Ct. 577 (noting that the Supreme Court in *Branzburg* "indicated a reluctance to recognize a constitutional privilege where it was 'unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury.'") (citing *Branzburg,* 408 U.S. at 693, 92 S.Ct. 2646).

We note that news organizations are not without judicial protection in the event that discovery requests are oppressive or impose undue burden, or simply ask for "large amounts of data of dubious relevance." *Smith,* 135 F.3d at 970. Under the Federal Rules of Civil Procedure, discovery may be had only of material that is "relevant," *see* Fed.R.Civ.P. 26(b)(1), and a court may, upon a motion by a party, issue protective orders "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c). In *Herbert,* the Supreme Court emphasized the importance of these provisions in controlling abuse of the discovery process:

> the discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, *speedy,* and *inexpensive* determination of every action." To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" *should be firmly applied,* and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Rule 26(c). *With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process.*

*Herbert,* 441 U.S. at 177, 99 S.Ct. 1635 (emphasis added). In addition to the provisions specifically mentioned by the Supreme Court, we note that Rule 26(b)(2) authorizes the district court to limit discovery if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed.R.Civ.P. 26(b)(2).

Our holding today is that there is no journalists' privilege for nonconfidential information. We emphasize that we in no way intend to cast doubt on our precedent which

establishes that, at least in civil cases, confidential information and sources are protected from disclosure by a qualified journalists' privilege based on the First Amendment. Moreover, our recognition of a qualified privilege to protect confidential information in civil cases, while distinguishing *Branzburg*, is entirely consistent with the position we have reached in this case, relying on *Branzburg*. In *Branzburg*, the Supreme Court acknowledged that "[t]he argument that the flow of news will be diminished by compelling reporters to aid the grand jury in a criminal investigation is not irrational," but nevertheless declined to recognize a First Amendment privilege where it was "unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify *before a grand jury*." 408 U.S. at 693, 92 S.Ct. 2646 (emphasis added).

By contrast, a rule of compelled disclosure in civil cases generally, and not just in grand jury proceedings, would likely have a much greater deterrent effect on a journalist's future sources simply because of the increased number of occasions on which a journalist could be called upon to disclose his or her sources. Thus, in *Baker*, we were appropriately concerned about the threat to a journalist's ability to secure confidential information if there were no qualified privilege to protect confidential information against disclosure in civil cases. Accordingly, we recognized that "there are circumstances, at the very least in civil cases" where the public's interest in nondisclosure would outweigh "the private interest in compelled testimony." *Baker*, 470 F.2d at 783. Other Circuits have also recognized a qualified privilege in civil cases, distinguishing *Branzburg* on the basis that "in civil cases, ... the public interest in effective criminal law enforcement is absent," *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C.Cir.1981), or reasoning that the interests of the press and the government in keeping identities of informants are more aligned. *See Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir.1980) (reasoning that "there is a more apparent interest in protecting the confidentiality of journalists' sources in libel cases than in grand jury proceedings ... [because] the prosecutor ha[s] an interest in

keeping the informant's identify secret in order to protect him from reprisal").

The balance of interests is crucially different, however, where the information sought to be protected is not confidential. In such cases, there is no danger that journalists will lose access to future confidential sources. *Cf. Smith*, 135 F.3d at 970 (finding that the "danger that sources will dry up" when journalists are compelled to disclose nonconfidential information was "less substantial"). It is also unlikely that nonconfidential or "on-the-record" sources will be deterred from communicating with the press for fear that their statements will be disclosed to the public because on-the-record sources have an expectation, before they talk to the media, that their nonconfidential statements will be made public when they are aired by the media. *Id.*

In sum, there is no indication that journalists' ability to obtain news will be diminished if there is no privilege for nonconfidential information, or that the editorial process will be hampered or news organizations overburdened by unreasonable discovery requests. Any threat to the freedom of the press or the free flow of information is therefore either too speculative or too remote to justify the creation of a constitutional privilege. *See, e.g, Branzburg*, 408 U.S. at 690–91, 92 S.Ct. 2646; *University of Pennsylvania*, 493 U.S. at 200, 110 S.Ct. 577. Absent any infringement of the First Amendment, the public interest in nondisclosure cannot be said to outweigh a civil litigants need for relevant information.

C. *Applying These Principles to the Subpoenas in Question*

■ We now consider the subpoenas issued in this case. We first note that the information sought by the Gonzaleses contained no confidential information. Indeed, there was not even an on-the-record source. Accordingly, the information sought by the subpoenas was not protected by any journalists' privilege. We do not need to determine, therefore, whether the information is "critical or necessary" to the maintenance of the Gonzaleses' claims, or is obtainable from another source, under the *Petroleum Products* test. The only question is whether the information

is relevant to the Gonzaleses' case and discovery should not otherwise be limited under Fed.R.Civ.P. 26.

The subpoenaed information related to camera footage, some of which has already been aired by NBC, of a car and an allegedly illegal stop made by a Louisiana Deputy Sheriff, who has also requested a copy of the footage. This information is clearly relevant to the Gonzaleses' case. As the district court found, it was relevant to proving a pattern and practice of illegal stops by Deputy Pierce. The information would also provide cogent evidence of whether or not Deputy Pierce in fact engaged in the type of illegal conduct alleged.

Nor do we find plaintiffs' subpoena in this case to be overbroad, burdensome or harassing. The Gonzaleses and Deputy Pierce requested particular footage recorded by the Dateline camera: the footage of the car in motion prior to the stop by Deputy Pierce, the footage of the stop itself and Deputy Pierce's interaction with the Dateline crew. Additionally, the district court appropriately declined to order deposition testimony from NBC representatives, requiring instead affidavits authenticating the videotapes. Accordingly, we do not regard the subpoenas served on NBC, as limited by the district court, to constitute an undue burden on NBC.

## III. CONCLUSION

For the foregoing reasons, we affirm the order of the district court directing NBC to produce to the Gonzaleses and Deputy Pierce the unbroadcast, nonconfidential videotape requested in their subpoenas, and the order of the district court holding NBC in contempt for non-compliance with its initial order.